FRED H. BAUERMEISTER AND DOROTHY L. BAUERMEISTER, HUSBAND AND WIFE, AND ROBERT A. BAUERMEISTER, INDIVIDUALLY, APPELLEES AND CROSS-APPELLANTS, V. TIMOTHY J. MCREYNOLDS, APPELLANT AND CROSS-APPELLEE, RONALD B. ROOTS AND RESOURCE RECYCLING, INC., APPELLEES AND CROSS-APPELLEES, AND RICHARD P. DEAVER AND CLARA E. DEAVER, HUSBAND AND WIFE, APPELLEES.

571 N.W.2d 79

Filed December 19, 1997.   No. S-94-1088.

William Jay Riley, of Fitzgerald, Schorr, Barmettler & Brennan, P.C., for appellant.

Charles H. Wagner, of Edstrom, Bromm, Lindahl, Wagner & Miller, for appellees Bauermeister.

Steven E. Achelpohl for appellee Roots.

John ·C. Wieland and Monica Green Kruger, of Raynor, Rensch & Pfeiffer, for appellee Resource Recycling.

CAPORALE, CONNOLLY, and GERRARD, JJ., and REHMEIER, D.J., and FAHRNBRUCH, J., Retired.

GERRARD, J.

The plaintiffs-appellees, Fred H. Bauermeister and Dorothy L. Bauermeister and their son, Robert A. Bauermeister, filed a

suit in equity against attorney Timothy J. McReynolds; Clara E. Deaver and Richard P. Deaver, Fred's sister and her husband; Resource Recycling, Inc., the Bauermeisters' joint venture business entity; and Ronald B. Roots, their joint venture partner. Among the theories of recovery pled were fraud, undue influence, business coercion, concealment and misrepresentation of facts, conflict of interest, and failure to disclose. As for relief, the Bauermeisters prayed for rescission of an agreement and restitution of all amounts paid to McReynolds, Roots, and Resource Recycling in regard to their share of royalties pursuant to the operation of a landfill by Waste Management of Nebraska, Inc., on the Bauermeisters' and the Deavers' property.

The Deavers answered by joining in the Bauermeisters' prayer for relief and cross-claiming against McReynolds seeking rescission and reformation of the agreement, as well as a declaration of rights should the court order restitution with respect to payments received by McReynolds.

Roots answered by denying the substance of the allegations and asserting the affirmative defenses of laches, ratification, and equitable estoppel. Roots also cross-claimed against the Bauermeisters, seeking a declaration of rights and reformation of the agreement should restitution be ordered with respect to McReynolds. In addition, Roots filed a separate cross-petition for declaratory relief against the Deavers and a separate cross-petition against McReynolds, alleging a breach of fiduciary duty and legal malpractice.

Resource Recycling answered, as did Roots, by denying the substance of the allegations and asserting the affirmative defenses of laches, ratification, and equitable estoppel.

McReynolds answered all petitions and cross-petitions by denying the substance of the allegations and asserting the affirmative defenses of laches, of equitable estoppel, and that certain actions were barred by the applicable statutes of limitation.

After a 14-day bench trial, the district court denied the Bauermeisters' prayer for rescission and restitution of all money paid to the defendants. The district court also denied the Deavers' prayer for relief. However, the district court concluded that McReynolds' attorney fees in this matter were clearly excessive and ordered reformation of the agreement in that

regard. McReynolds timely appealed, and the Bauermeisters cross-appealed and successfully petitioned to bypass the Nebraska Court of Appeals. For the reasons that follow, we affirm in part, and in part reverse and remand with directions.

## FACTUAL BACKGROUND

Roots had considerable experience in the field of solid waste disposal and in siting and operating landfills in Nebraska. McReynolds had represented Roots since about 1976 in regard to his business transactions. The Bauermeisters owned and farmed 200 acres of land along the northern boundary of western Douglas County. The Bauermeisters also farmed an adjoining 80 acres owned by the Deavers. In the early 1980's, Roots recognized that the existing Douglas County landfill was quickly approaching its capacity. Roots thought that if he could site a private landfill in Douglas County before the county's current landfill reached capacity, he would be in a favorable position to contract with Douglas County for the provision of landfill services once its current landfill was filled.

Roots recognized that the Bauermeister-Deaver property was suitable for just such a project. On August 31, 1985, Fred and Robert Bauermeister entered into an agreement with Roots to form a joint venture for the purpose of bidding a private landfill contract with Douglas County, as well as pursuing other private landfill projects on the Bauermeister-Deaver property. The joint venture agreement provided that rent would be paid to the Bauermeisters for land actually used for landfill purposes and that all capital costs, liabilities, and profits from the operation of the landfill would be shared equally between the Bauermeisters and Roots.

During the negotiations preceding the formation of the joint venture entity, Roots was represented by McReynolds, and the Bauermeisters were represented by their family attorney, Seymour Katz. Katz advised the Bauermeisters that once formed, the joint venture should be represented by McReynolds due to his considerable expertise in this area. Accordingly, the joint venture hired the law firm of Croker, Huck & McReynolds to represent it on an hourly fee basis.

From 1985 to 1987, the joint venture worked to obtain approval for the operation of a private landfill on the

Bauermeister-Deaver property. This effort was unsuccessful in siting a landfill; however, the joint venture did obtain composting and recycling permits. During this period, Robert Bauermeister was primarily involved in pursuing the joint venture's interest on behalf of the Bauermeister family. Further, the joint venture agreement contemplated the formation of a corporation, Resource Recycling, to facilitate the operation of any landfill sited.

In early 1988, Douglas County's need for landfill space had become more acute. In January, Roots again approached McReynolds and his partner, Robert Huck, but this time with the idea of siting a public landfill on the Bauermeister property operated by Resource Recycling. McReynolds and Huck were hesitant to assist Roots in his renewed attempt to site a landfill on the Bauermeister property, as the joint venture still owed Croker Huck $42,000 in legal fees from the previous effort. Furthermore, substantial legal assistance would be needed to site a public landfill on the Bauermeister property, and Roots and the Bauermeisters were unwilling and unable to pay for continuing legal services on an hourly fee basis.

In May or June 1988, Roots approached McReynolds and Huck with a proposal he termed a "lean forward" fee agreement. Roots characterized this agreement as simply an incentive system: if successful, everyone profits; if not, then they all lose together. Roots proposed that the joint venture pay McReynolds $1 per ton of the gate fee if, and only if, the joint venture succeeded in siting the landfill. McReynolds thought that the project had a 5- to 10-percent chance of succeeding, but, nonetheless, eventually agreed to represent the joint venture on this "lean forward" contingency basis.

However, based on Roots' estimate of 300,000 tons of garbage per year, McReynolds thought a fee of $1 per ton was clearly excessive. After considering various factors, such as the chance of success, the volume of anticipated waste per year, the life of the landfill, the costs of obtaining the necessary approvals, the costs of landing a contract with Douglas County, the costs of litigation if successful, and the present value of all expenditures, McReynolds proposed a fee of 30 cents per ton for county waste and 50 cents per ton for Omaha waste.

Roots testified that he discussed his "lean forward" concept with Fred Bauermeister, who at this time had assumed primary responsibility for the Bauermeister family interest in the joint venture. After consulting with his family, Fred Bauermeister agreed to the "lean forward" proposal. On August 5, 1988, Roots, both individually and on behalf of Resource Recycling, signed an agreement with McReynolds memorializing the agreed-upon fee structure. Fred Bauermeister's signature appears on this document as a witness.

About this same time, Katz, the Bauermeister family attorney, joined Croker Huck on an "of counsel" basis. The circumstances which led to Katz' joining the firm were unrelated to the joint venture. Roots, Katz, and McReynolds testified that immediately prior to the signing of the fee agreement, McReynolds discussed with Fred Bauermeister and Roots the potential conflict of interest created by Katz' joining the Croker Huck law firm. McReynolds testified that he told Fred Bauermeister and Roots that if they wanted the Croker Huck law firm to represent the joint venture, both he and Katz could no longer represent either of them in an individual capacity should a conflict arise between them.

McReynolds also told them they were free to bring in another attorney at any stage of the negotiations and free to take representation of the joint venture to another attorney. McReynolds said he specifically told Fred Bauermeister that any advice Katz gave him in this matter was not as his personal attorney, but as counsel for the joint venture. McReynolds, Katz, and Roots testified that after this potential conflict of interest was explained to Fred Bauermeister, he consented to the continued representation of the joint venture by Croker Huck.

Fred Bauermeister, on the other hand, testified that he was never informed of a potential conflict of interest by either McReynolds or Katz. Fred Bauermeister also testified that he merely witnessed the execution of the fee agreement and that the fee agreement was between McReynolds and Roots in conjunction with Resource Recycling. Fred Bauermeister said that Roots never discussed his "lean forward" concept with him and that at all times, he thought Katz was his personal lawyer and that he relied on Katz' advice in executing all documents.

From June through September 1988, Roots, McReynolds, and Huck lobbied members of the Douglas County board, as well as other governmental officials, in support of the joint venture initiative. In late September, Huck was contacted by counsel for Waste Management of North America, Inc. (Waste Management), inquiring as to whether the joint venture would be interested in working with Waste Management to bid the Bauermeister-Deaver site. This was not an unexpected development, as Roots had anticipated that Browning-Ferris, the current operator of the Douglas County landfill, might seek to bid the joint venture's site.

Waste Management initially proposed to either purchase or lease the Bauermeister land so that Waste Management could then bid the site. McReynolds proposed an arrangement where Waste Management would lease the Bauermeister-Deaver property, pay a royalty from the gate fee, and grant recycling rights to Resource Recycling. Fred Bauermeister and Roots agreed to pursue negotiations with Waste Management on these terms.

On October 31, 1988, Waste Management agreed to lease the site for $36,000 per year, pay a gate fee royalty of $1 per ton, and grant recycling rights to Resource Recycling. The recycling rights allowed Resource Recycling to pull all recyclable materials from the waste stream and to reserve for itself the gate fee attributable to this waste.

The landfill bid deadline was set for December 6, 1988, and Waste Management wanted the necessary agreements signed and submitted for its approval by Thanksgiving Day, November 24. On November 18, McReynolds and Katz met with Fred and Dorothy Bauermeister and Clara and Richard Deaver to discuss the proposed agreements. The facts and circumstances of what occurred at the November 18 meeting, as well as two subsequent November meetings, are under considerable dispute.

The principal agreement in dispute is one titled "Assignment and Allocation of Various Provisions Contained in Agreement for Lease of Real Estate" (assignment and allocation). This agreement proposed to allocate the $3,000 monthly rental income in proportion to the contribution of land: $2,250 for the Bauermeisters and $750 for the Deavers. Consistent with the August 5, 1988, fee agreement, the assignment allocated to

McReynolds 30 cents per ton of the gate fee royalty for non-Omaha waste and 50 cents per ton for Omaha waste. Consistent with the August 31, 1985, joint venture agreement, the Bauermeisters and Roots were to share equally in the profits from the operation of the landfill, that being the remainder of the gate fee royalty and the recycling rights. The Deavers were to receive no part of the profits. McReynolds testified that Richard Deaver objected to this proposed division of profits and that the Bauermeisters, particularly Dorothy, were adamant that the Deavers take nothing of the gate fee.

In an effort to overcome Richard Deaver's objection, McReynolds suggested to Fred Bauermeister that the Deavers receive a percentage of their recycling rights. On November 21, 1988, a meeting was held to explain the new terms which allocated 50 percent of Resource Recycling to Roots and divided the Bauermeisters' share of Resource Recycling, 37.5 percent to the Bauermeisters and 12.5 percent to the Deavers if, and only if, the Waste Management bid was accepted. There is some dispute as to whether Richard Deaver agreed to accept the recycling percentage in lieu of a portion of the gate fee; however, the evidence reveals that Deaver asked to have an attorney review the agreement before signing. McReynolds and Katz testified that they told Deaver that would be a good idea, but that he must have another attorney review the agreement quickly as they were under a time deadline. Toward this end, McReynolds and Katz said that the amended agreement was left at the front desk of the Croker Huck office, and it was retrieved by somebody the next day.

Fred Bauermeister was unable to specifically recall the November 18 and 21 meetings with the Deavers, but did not dispute that such meetings had occurred. Bauermeister agreed that sometime prior to November 30, meetings were held in which the division of the rent and royalty payments was discussed. Richard and Clara Deaver testified that they had no specific recollection of the November 18 meeting and that at the November 21 meeting, the proposed lease and assignment agreements were discussed, but that the gate fee split was not mentioned.

Because of the delay necessitated by Deaver's objection, the deadline with Waste Management was postponed until

November 30. On November 30, the parties met again at the Croker Huck office to execute the lease and assignment and allocation documents. McReynolds and Katz testified that the documents were read out loud or gone over word for word with the Bauermeisters and the Deavers. The Deavers testified that they did not recall whether the documents were read to them on November 30 prior to signing. Fred Bauermeister said he had some memory that some of the documents were read before signing.

McReynolds testified that Richard Deaver asked whether another attorney was required to review the documents and that McReynolds told him there was no such requirement. The Bauermeisters and the Deavers both testified that Katz and McReynolds pressured them to sign the documents or the deal would not get done. Fred Bauermeister testified that McReynolds and Katz told him the deal was fair.

Richard Deaver testified that when he told Katz he would like to take the documents to another lawyer, Katz told him that would not be necessary. Furthermore, Richard Deaver claimed that he first learned that his wife would not share in the gate fee split after the November 30 meeting when, upon returning home, he read the relevant provision of their copy of the assignment and allocation agreement. Richard Deaver said he telephoned Katz and objected shortly thereafter. Clara Deaver said that when her husband asked to have someone else look at the documents, Katz said, "No, we will take care of it." Fred Bauermeister testified that when Richard Deaver suggested or questioned whether another attorney should look at the assignment and allocation agreement, Katz and McReynolds said that would not be a good idea because it could blow the whole deal.

Robert Bauermeister testified that he, as well as his father and mother, indicated they would like more time before signing the agreements, but that Katz told them it was in their best interests to sign the agreements and that if they did not sign that day, the deal with Waste Management would not come about. Robert Bauermeister said that he indicated to Katz that he thought his family was giving up too much and that Katz responded by saying he thought the deal was fair and equitable.

The documents were eventually executed that day and sent express delivery to Waste Management in Chicago. Because

Waste Management had bid another site in addition to the Resource Recycling site, Huck, McReynolds, and Roots continued to lobby county officials in support of Resource Recycling's bid with Waste Management. On December 20, the county board selected the Waste Management bid of the joint venture site. During the next year, six lawsuits in regard to the proposed landfill were filed. Croker Huck participated in the successful defense of those suits in which Fred Bauermeister or Resource Recycling was a named defendant. At some point, the county required Waste Management to own the landfill site. McReynolds drafted a purchase agreement which incorporated the prior assignment and allocation agreement and, in effect, provided the Bauermeisters and the Deavers with the same income as the prior lease agreement, with the option to buy back their land for $1 at the end of the landfill contract. This document was executed on March 22, 1989.

The landfill opened on August 31, 1989, and its operation has resulted in a roughly one-third split of the $1 gate fee royalty. Between September 1989 and October 1993, the Bauermeisters, Roots, and McReynolds individually received monthly royalty payments ranging between $9,000 and $21,000. By the time of trial, each had received around $700,000 in income from the gate fee split. It is estimated over the life of the landfill, the fee split could provide each with as much as $4,000,000. Resource Recycling, however, has not produced any income pursuant to its recycling rights due to the fact that an unexpectedly low gate fee bid by Waste Management made recycling unprofitable at the time of trial.

Prior to the operation of the landfill, the Bauermeisters' annual income from farming was about $12,000. Notwithstanding, following a conversation with Richard Kogler, a Waste Management vice president, the Bauermeisters became dissatisfied with the amount of income accruing to Roots and McReynolds. According to Fred Bauermeister, Kogler indicated that he thought the fees received by McReynolds and Roots were excessive. Kogler denies having such a conversation with Fred Bauermeister. On January 23, 1992, the Bauermeisters filed their suit in equity seeking rescission of only the assignment and allocation agreement and restitution of the gate fee income paid Roots and McReynolds. The

district court upheld the assignment and allocation agreement in all respects except as to McReynolds' contingency fee.

The trial court concluded that McReynolds and Katz failed to fully disclose to the Bauermeisters the extent of the conflict of interest created by Katz' joining the Croker Huck law firm and that Katz, while representing the joint venture, advised the Bauermeisters in an individual capacity that it was in their best interests to sign the agreements. In addition, the court concluded that McReynolds' potential fee of $4 million was unconscionable and that the $900,000 fee already realized was clearly excessive.

Under the authority of the court to determine the reasonableness of attorney fees, the trial court allowed McReynolds to keep the royalty payments already received, but cut off all further payments to him by rescinding that part of the assignment and allocation agreement which provided for McReynolds' fee. Finding rescission inappropriate as to the remainder of the agreement, the court reformed the agreement as to the Bauermeisters and Roots, splitting evenly the $1 gate fee.

## ASSIGNMENTS OF ERROR

McReynolds assigns that the district court erred in finding (1) that his attorney fees were clearly excessive and reforming the contract to reduce these fees and (2) that the Bauermeisters had standing or a right to contest McReynolds' attorney fees and that the claims of excessive fee were not barred by the statute of limitations for professional malpractice or by laches.

The Bauermeisters cross-appeal and assign that the trial court erred in (1) affirming and enforcing the assignment and allocation agreement as to Roots and Resource Recycling, (2) awarding McReynolds a fee in excess of $800,000 by allowing him to retain that portion of the gate fee already received, and (3) not assessing costs of the action in favor of the Bauermeisters.

## STANDARD OF REVIEW

In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact,

the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Midlands Rental & Mach. v. Christensen Ltd.*, 252 Neb. 806, 566 N.W.2d 115 (1997); *Hanigan v. Trumble*, 252 Neb. 376, 562 N.W.2d 526 (1997).

## ANALYSIS

### STANDING

McReynolds first contends that the Bauermeisters do not have standing to assert their claims. McReynolds argues that only the client, Resource Recycling, has a right to contest the reasonableness of his fee and that because the Bauermeisters were never his clients individually, they are without standing in this matter.

However, this argument does not properly characterize the Bauermeisters' cause of action. The Bauermeisters have, in essence, pled and attempted to prove at trial that they were duped by McReynolds, Katz, and Roots into signing the November 30, 1988, assignment and allocation agreement due to fraud, undue influence, misrepresentation, and business coercion. The Bauermeisters' cause of action is predicated not on a right appurtenant to the joint venture, but on a right due all parties to the assignment and allocation agreement: that their assent was validly obtained. Thus, McReynolds' standing argument is without merit.

### STATUTE OF LIMITATIONS

McReynolds argues that all of the Bauermeisters' claims, including the claim of excessive fees, are based on his alleged professional misconduct or lack of fidelity arising out of an attorney-client relationship. As such, because the Bauermeisters' malpractice cause of action arose more than 2 years before suit was filed, their cause of action is barred by Neb. Rev. Stat. §§ 25-208 and 25-222 (Reissue 1995).

McReynolds relies on *Gravel v. Schmidt*, 247 Neb. 404, 527 N.W.2d 199 (1995), wherein we held that although an attorney-client relationship rests in contract, an attorney's alleged professional misconduct does not give rise to a breach of contract action, but, rather, gives rise to a professional negligence action.

In *Gravel v. Schmidt, supra*, the plaintiff, Tim Gravel, was promised by William Tomek, an attorney representing Gravel's deceased father's estate, that he would inherit somewhere between $50,000 and $100,000 upon final settlement of the estate. Relying on Tomek's promise, Gravel entered into a contract to purchase real property. Gravel eventually received around $15,000 from the estate and subsequently defaulted on the land purchase contract. Gravel sued, claiming that Tomek had breached a contract between Gravel and Tomek when Gravel inherited substantially less than what Tomek had promised. Although we held that a contract cause of action such as Gravel's was really a professional negligence cause of action, we expressly assumed without deciding the issue before us now.

A lawyer's duty is to his or her client and does not extend to third parties absent some facts which establish a duty. *Id.*; *Earth Science Labs. v. Adkins & Wondra, P.C.*, 246 Neb. 798, 523 N.W.2d 254 (1994). There was never an attorney-client relationship between McReynolds individually and the Bauermeisters. McReynolds' professional duty goes only to the joint venture, Resource Recycling. In fact, McReynolds asserts this very argument in claiming that the Bauermeisters do not have standing to bring their claims. Further, we see no special facts in this record that would allow us to conclude that McReynolds individually owed a duty to the Bauermeisters separate and distinct from the duty he owed to Resource Recycling. Thus, the Bauermeisters' cause of action is not for professional negligence, and McReynolds' statute of limitations claim is without merit.

## EQUITABLE RESCISSION

In an equitable rescission action based on fraud, undue influence, misrepresentation, or business coercion, the proponent bears the burden of proving each element by clear and convincing evidence. See, *Schuelke v. Wilson*, 250 Neb. 334, 549 N.W.2d 176 (1996); *Goff v. Weeks*, 246 Neb. 163, 517 N.W.2d 387 (1994); *McCubbin v. Buss*, 180 Neb. 624, 144 N.W.2d 175 (1966). In its order, the trial court did not expressly state that it utilized this heightened evidentiary standard. However, it is presumed in a bench trial that the judge was familiar with and

applied the proper rules of law unless it clearly appears otherwise. *State v. Orduna*, 250 Neb. 602, 550 N.W.2d 356 (1996).

In regard to the Bauermeisters' claims against appellees Roots and Resource Recycling, the trial court concluded that the Bauermeisters had failed to prove fraud, either actual or constructive, on Roots' part, and that Roots was not guilty of business coercion, nor did he exert undue influence on the Bauermeisters. We agree. The evidence establishes that the Bauermeisters, in executing the assignment and allocation agreement, did not rely on Roots, but, instead, relied on Katz. Roots and the Bauermeisters were unable and unwilling to pay attorney fees on an hourly fee basis in August 1988. Moreover, in the joint venture agreement, executed at a time when each was individually represented by counsel, Roots and the Bauermeisters agreed to split equally all profits from the operation of a landfill on the Bauermeister property. Thus, the trial court correctly concluded that the assignment and allocation agreement should be enforced as written in regard to Roots and Resource Recycling.

We note that the Bauermeisters did not assign as error in their cross-appeal the district court's failure to rescind the assignment and allocation agreement on the grounds of misconduct with respect to McReynolds or Katz. Thus, this issue is not before us.

Notwithstanding, the Bauermeisters argue that the assignment and allocation agreement was a modification of the prior fee agreement and that McReynolds therefore had an affirmative duty to make a full and fair disclosure of all material facts affecting the transaction at issue, and ensure that the transaction in question was fair.

Whatever merit there may be to the Bauermeisters' argument, it nonetheless does not address the determinative issue, that being the remedy requested by the Bauermeisters. The purpose of rescission is to place the parties in a status quo, that is, return the parties to their position which existed before the rescinded contract. *Kracl v. Loseke*, 236 Neb. 290, 461 N.W.2d 67 (1990). The trial court concluded that it was impossible for equity to substantially restore the parties to the positions they held prior to the execution of the assignment and allocation agreement. We agree.

The land at issue has been conveyed to Waste Management for use as a landfill. No one wants this conveyance rescinded or this use terminated. Further, the joint venture business opportunity to bid for the Douglas County landfill is forever lost. McReynolds relied on his share of the royalties to compensate Katz and Huck for their services. The Bauermeisters have entered into an agreement for the division of their income pursuant to the agreement. Roots has sold his share of Resource Recycling in reliance on the agreement. Clearly, it would be impossible to return these parties to a status quo.

Moreover, a party seeking rescission of a contract on the grounds of fraud, misrepresentation, or business coercion must do so promptly upon the discovery of the facts giving rise to the right to rescind. See, *McCubbin v. Buss*, 180 Neb. 624, 144 N.W.2d 175 (1966); *Mazanec v. Lincoln Bonding & Ins. Co.*, 169 Neb. 629, 100 N.W.2d 881 (1960); *Wegner v. West*, 169 Neb. 546, 100 N.W.2d 542 (1960). The parties executed the assignment and allocation agreement on November 30, 1988. Robert Bauermeister testified that the Bauermeisters executed the agreements because they felt as though they had a financial gun to their head. Nonetheless, the Bauermeisters ratified their actions on March 22, 1989, when they executed the purchase agreement which expressly incorporated the assignment and allocation agreement. It was not until nearly 3 years later, on January 23, 1992, that the Bauermeisters filed their petition. At that time, the Bauermeisters had received over $425,000 of income from the operation of the landfill.

We conclude that the Bauermeisters' 3-year delay, all the time claiming a financial gun had been placed at their head, and the acceptance of over $425,000 in benefits pursuant to the contract, forecloses the Bauermeisters' opportunity to claim that their assent to the contract was invalid. " '[One] who seeks equity must do equity.' " *Kracl v. Loseke*, 236 Neb. at 304, 461 N.W.2d at 76. Plainly, the Bauermeisters have failed to do equity.

## ATTORNEY FEES

McReynolds next contends that the trial court erred when it found that McReynolds had received a clearly excessive fee

and, thereafter, reformed the contract to reduce that fee. The trial court concluded that McReynolds' fee was a contingency fee and that by any standard, it was clearly excessive and totally unconscionable. The trial court, pursuant to its inherent power to regulate the bar and determine the reasonableness of a contingent fee, cut off all royalty payments to McReynolds accruing after February 28, 1994.

On de novo review, two issues are presented for our consideration: whether the fee agreement was a permissible transaction and, if so, whether the fee received was excessive.

McReynolds had initially characterized the August 5, 1988, fee agreement as a contingent fee. However, at trial, McReynolds' expert, Lawrence Raful, dean of the Creighton University School of Law, offered a different view. Raful testified that the fee agreement was not a contingent fee agreement, but, instead, was a business association between the attorney and his client. We agree.

A contract for contingent attorney fees is one which provides that the lawyer shall receive a fee, usually a percentage of the recovery, if and only if the plaintiff recovers from the defendant in litigation or settlement. See Charles W. Wolfram, Modern Legal Ethics § 9.4.1 (West 1986).

In the instant appeal, although recovery by McReynolds was contingent on a successful result, recovery was not pursuant to litigation or settlement of a disputed claim. Instead, McReynolds' fee has more characteristics of a business relationship between an attorney and a client than it does of a contingency fee. Due to the fiduciary nature of the attorney-client relationship and because of the very real risk that self-interest will interfere with the lawyer's exercise of judgment on behalf of the client, a lawyer may enter into a business transaction with a client only under limited conditions. *People v. Bennett*, 810 P.2d 661 (Colo. 1991). Those conditions are delineated in Canon 5, DR 5-104(A), of the Code of Professional Responsibility: "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his or her professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

To establish a violation of DR 5-104(A), it is necessary to show (1) that the attorney and the client had differing interests in the transaction, (2) that the client expected the lawyer to exercise his or her professional judgment for the protection of the client, and (3) that the client consented to the transaction without full disclosure. *State ex rel. NSBA v. Thor*, 237 Neb. 734, 467 N.W.2d 666 (1991).

Prof. William Hodes of Indiana University School of Law testified on behalf of the Bauermeisters concerning the issue of full disclosure. Professor Hodes concluded that McReynolds, Katz, and Huck had failed to fully disclose to the Bauermeisters the extent of the potential conflicts in regard to McReynolds' representation of the joint venture and in regard to Katz' joining the Croker Huck law firm.

However, much of Professor Hodes' analysis is predicated on an assumption not supported by the record. Hodes assumes that when the joint venture was formed in 1985, McReynolds represented both Roots and the Bauermeisters individually. This is simply not accurate. When Roots and Robert and Fred Bauermeister formed the joint venture, they were represented by separate counsels. Katz represented the Bauermeisters, and McReynolds represented Roots. Katz was not "of counsel" for Croker Huck at this time. After the joint venture agreement was signed, it was the joint venture, not the Bauermeisters or Roots individually, that sought representation from Croker Huck.

A lawyer who represents a business entity owes his or her allegiance to the entity, not to an individual shareholder. Canon 5, EC 5-18, of the Code of Professional Responsibility. Thus, at the time the assignment and allocation agreement was executed, McReynolds and Katz owed their allegiance to the joint venture and its business entity, Resource Recycling.

McReynolds and Katz shared a common interest with the joint venture, that being the siting of the landfill. If the joint venture succeeded, then McReynolds and Katz would profit. However, if the joint venture failed, then McReynolds and Katz would get nothing. Moreover, McReynolds and Katz were powerless to influence the contribution of waste into the landfill and thus alter the proportion of royalty payments. The trial court concluded that the assignment and allocation agreement gave

McReynolds substantially more in fees than did the August 5, 1988, fee agreement. This conclusion is not supported by the evidence. The assignment and allocation agreement provided the identical compensation schedule with respect to McReynolds as did the fee agreement.

At all times, McReynolds and Katz exercised their professional judgment for the protection of the joint venture. The most obvious example of this is McReynolds' refusal of Roots' initial "lean forward" compensation offer of $1 per ton. McReynolds testified that Roots' proposed fee was clearly excessive, based on Roots' annual tonnage estimate. After considering all the relevant factors, McReynolds offered to provide services for what turned out to be one-third of the amount proposed by Roots.

Furthermore, not only did the client, Resource Recycling, consent to all transactions concerning the landfill after full disclosure of any interest on the part of the Croker Huck law firm, but on appeal to this court, Resource Recycling argues that the assignment and allocation agreement as written reflects the intent of the parties at the time of execution.

The trial court found that although the evidence was in great conflict, neither McReynolds nor Katz ever told the Bauermeisters that they could get another attorney, discussed the potential conflicts of interest that could arise once Katz joined Croker Huck, or told Fred Bauermeister that Katz could not represent him. Even giving deference to the fact that the trial judge heard and observed the witnesses, we are unable to reach the same conclusion as the trial court in our de novo review of the record.

The testimony of McReynolds, Katz, and Roots unambiguously asserts that Fred Bauermeister was apprised of the potential conflict of interest created by Katz' joining the law firm, was told he was free at any time to see another attorney, and was specifically told that Katz could no longer represent him in an individual capacity regarding joint venture matters. Although Fred Bauermeister testified that he was not informed of the potential conflict of interest, his testimony must be viewed in its proper perspective.

At the time of trial, Fred Bauermeister had significant memory lapses and problems recalling details of crucial events.

During cross-examination and in his depositions, Bauermeister testified that he did not have a specific recollection of the majority of the frequent meetings, telephone calls, and discussions which occurred during this period in regard to the joint venture. Much of the time, when questioned in detail, Bauermeister would admit that he simply did not recall a particular event or conversation, not that the event or conversation did not in fact occur.

Most telling is the fact that the record is silent as to any occasion where the Bauermeisters sought advice from McReynolds or Katz concerning their individual interests vis-a-vis the joint venture or Roots. Furthermore, it was only after the seed of discontent was sown by Waste Management's vice president Kogler that Fred Bauermeister even began to question the fairness of the assignment and allocation agreement.

Accordingly, we conclude that the fee agreement in this matter was a business relationship between an attorney and a client wherein the interests of the attorney and the client did not differ, the client expected the attorney to exercise his professional judgment for the client's protection, and the client consented to the transaction with full disclosure. Thus, the fee agreement was not a prohibited transaction.

The remaining issue is whether McReynolds' fee was clearly excessive. Canon 2, DR 2-106, of the Code of Professional Responsibility provides:

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

See, also, *Kirby v. Liska*, 214 Neb. 356, 334 N.W.2d 179 (1983).

Our de novo review of the record compels the conclusion that McReynolds' fee was not clearly excessive. Never before had a privatized public landfill been sited in Nebraska. When McReynolds agreed to Roots' "lean forward" proposal, he thought the joint venture had a 5- to 10-percent chance of success. McReynolds initially estimated he would spend $100,000 in billable hours working on the landfill project. In fact, $250,000 of Croker Huck time was spent in pursuit of the landfill contract. McReynolds testified that because of his commitment to the joint venture project, he lost two large clients that normally required a significant portion of his time.

Over the years, McReynolds and Huck had established a close working relationship with members of the Douglas County Board of County Commissioners and other governmental officials. There was no question that these relationships greatly benefited the joint venture. Further, the only way that the joint venture could possibly take advantage of these relationships was to convince McReynolds and Huck to provide their services on a "lean forward" basis, as Roots and the Bauermeisters were unwilling and unable to pay hourly attorney fees which, in this case, eventually reached in excess of $250,000.

If Roots and the Bauermeisters were to benefit at all, they needed to convince McReynolds to accept a great deal of risk in exchange for a greater reward than his usual hourly fee. The results obtained by McReynolds and Huck were excellent, and the benefit to the client was extraordinary. By the time of trial,

the joint venture profit, split evenly by the Bauermeisters and Roots, had reached nearly $1.4 million; and this is without capitalizing on the recycling rights reserved.

We conclude, in light of all the facts, that McReynolds' fee is not one where a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Therefore, we reverse that portion of the district court order reforming the assignment and allocation agreement in regard to the gate fee royalty payable to McReynolds and hold that the November 30, 1988, assignment and allocation agreement should be upheld as written in all respects.

## CONCLUSION

For the foregoing reasons, we affirm the district court's denial of the Bauermeisters' prayer for rescission of the assignment and allocation agreement, and reverse that portion of the district court order reforming the assignment and allocation agreement in regard to the gate fee royalty payable to McReynolds. Thus, we affirm in part, and in part reverse and remand with directions to the trial court to enter judgment consistent with this opinion, reinstating and upholding the November 30, 1988, assignment and allocation agreement as written with respect to all parties. Having so held, we need not address the Bauermeisters' remaining assigned error concerning costs.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

WHITE, C.J., and WRIGHT, J., not participating.