COUNTY OF SARPY, APPELLEE, V. JANSEN REAL ESTATE CO., APPELLANT, AND BANK OF PAPILLION, APPELLEE.

584 N.W. 2d 824

Filed September 22, 1998.    No. A-97-370.

Dixon G. Adams, of Adams & Sullivan, for appellant.

Michael A. Smith, Deputy Sarpy County Attorney, for appellee County.

HANNON, IRWIN, and INBODY, Judges.

HANNON, Judge.

Sarpy County filed this action to foreclose delinquent real estate taxes in 1989 and 1990 against three lots owned by Jansen Real Estate Co. (Jansen). The lots are located in Western Hills, a subdivision located in Sarpy County. The subdivision is a quarter section of real estate which until 1991 had been valued for agricultural purposes under Neb. Rev. Stat. §§ 77-1344 through 77-1348 (Reissue 1990). The taxes foreclosed against the lots were the additional taxes assessed when the quarter section ceased to qualify for the special value. The taxes were in the amount that would have been due for the quarter section had the special value not been elected before 1991. Sarpy County seeks to foreclose all the taxes against the three lots. Jansen resists the foreclosure on the basis that the county is estopped by errors and irregularities in levying and assessing the tax and misrepresentations relied upon by Jansen and that Sarpy County

seeks to foreclose all of the additional tax for the entire quarter section against the three lots. The trial court allowed foreclosure but apportioned the $23,755.51 additional taxes between the three lots and the remainder of the quarter section, thus allowing foreclosure of only $42.76 against each of the three lots. We conclude that the district court did not have the authority to apportion these taxes and that Sarpy County is not prevented from foreclosing the taxes for the reasons alleged, except that the taxes assessed against the entire quarter section cannot be foreclosed against the lots. We therefore reverse, and remand with directions to dismiss.

## SUMMARY OF FACTS

The parties stipulated that prior to April 1, 1991, the northwest quarter of Section 22, Township 14 North, Range 12 East of the 6th P.M., in Sarpy County, was owned by Masonic Lodge No. 39 and St. Paul's Methodist Church, and was primarily used for agricultural purposes. On April 1, title was transferred to Western Hills, Inc. (Western Hills). On August 1, Western Hills filed a plat, which subdivided the quarter section into 176 lots of varying sizes and streets, in the Sarpy County register of deeds office. On July 2, the Sarpy County treasurer had certified that there were no regular or special taxes due on the quarter section. On December 28, 1993, Western Hills conveyed Lots 26, 29, and 32 in the subdivision to Jansen.

Before being transferred to Western Hills, the quarter section had been valued for agricultural purposes rather than a higher value for other purposes as provided in § 77-1344. Western Hills did not apply for special valuation. On November 1, 1991, the county assessor notified Western Hills that the quarter section was subject to recapture and proceeded to assess the recapture against the property as provided in § 77-1348. The amount due from the 1989 tax year was $13,606.15, and $10,149.36 was due from the 1990 tax year. Western Hills was sent notice of this action.

Steven Griesmer, a title insurance agent for the company which insured title to the real estate, testified that about May 6, 1991, he searched the county records with respect to taxes, both general and special, assessed against the real estate. Griesmer

testified that when a search of the records is made for the possibility of special assessment taxes, particularly "greenbelt taxes," searches are made in the county treasurer's office. (We note that during trial, the attorneys and witnesses frequently referred to the taxes that were or could be recovered when special valuation under § 77-1344 ceased as "greenbelt taxes." We find no statutory foundation for the term, and we did not find the term helpful in this opinion. We therefore use it only when quoting the parties or witnesses.) When Griesmer made the search, he found no indication of special use valuation having been used. Griesmer testified that since May 1991, he has made similar searches against the individual lots, and although the additional tax is indexed against the quarter section, there is no indication of the additional tax indexed under the individual lots.

Griesmer testified that the county treasurer's records appear on a computer screen. A printout of a computer screen for current taxes against the quarter section was introduced. The printout lists Western Hills as the owner and states "LEGAL DESC NW1/4 22-14-12 (155.78 AC) PAPILLION." The printout has six columns which were headed as follows: "YEAR," "SEQ—NO SPA RCPTUR TX—SAL," "TAX DUE ADV RECVD," "TAX RECVD INT RECVD," "TOTAL RECVD," and "BALANCE DUE." The printout contains lines for each year from 1982 to 1990 in descending order and shows the tax for 1988 and each prior year to be approximately $2,000 per year. The printout shows these taxes were paid. For 1989 and 1990, the printout shows taxes of $3,292.62 and $2,817.24, respectively, and that they were paid. Finally, the printout shows the taxes assessed by special use for 1989 and 1990 and the balance due to be $13,606.57 and $10,149.36.

Griesmer testified that when he searched for taxes on the northwest quarter of Section 22, nothing appeared on the screen until after November 1, 1991. When asked what he did at the assessor's office, Griesmer testified: "At that time we had to — we were not allowed to look at the information, we basically had to ask the employees there to tell us yes or no, was the property filed for greenbelt protection." Griesmer testified that in May 1991, he asked these employees and was told the property

was not filed for greenbelt protection. Griesmer also testified that there was no indication of any special agricultural assessment on the screen as to "each individual lot in the subdivision" and that up to the time of trial, the amount claimed to be due for the entire quarter section was not posted against individual lots, but only against the quarter section.

Richard Campbell, who is a real estate appraiser employed by the Sarpy County assessor's office and the coordinator of the greenbelt valuation, testified that after examining the Western Hills subdivision plat and the above-described computer printout, there was no way for him to determine the amount of these taxes that should be assessed against the three individual lots "without just taking the entire amount [and] dividing it by the lots" and that this would not have accounted for the streets shown on the plat. Campbell testified that the No. 1 in the column "SEQ—NO SPA RCPTUR TAX—SAL" of the printout would notify someone that the land was under special valuation. (There is a No. 1 in the column for the years 1989 and 1990.)

Campbell testified that that system did not exist in 1991 and that in 1991, the records which would have shown that special valuation was used were kept on a piece of paper in a folder designated for each piece of property. This file folder would have shown both the regular valuation and the special valuation and would have contained a notation that the property was valued at a special value. Campbell testified that these records were available to the public for inspection and that he could recall no time when anyone was denied access to these records. Campbell also testified that the taxes were divided when a piece of property was subdivided. To do this, the assessor's office checks the record for the previous 4 years to determine the type of soil for the parcel which will no longer be for agricultural use and allocates the value based upon that consideration. Campbell did not testify as to why the taxes in question were not divided by the assessor's office. Campbell testified there was nothing in the treasurer's records in 1991 to indicate the property was valued at a special valuation in 1991.

After a trial, the court made specific findings of fact. Among other findings, the court found: "He [Griesmer] made further inquiry at the Assessor's office and was advised by the

Assessor's personnel there [were no recovered taxes from special use]. There may have been a folder in the Assessor's Office, but abstracters were not allowed to see this file." The trial court also found that the Sarpy County agents were at fault, but other than the above quote, the court did not specify as to how or when the agents were at fault. The court also found that it would be inequitable to charge the three lots with the entire tax assessed against the quarter section. The court computed the square footage of the three lots from the plat and apportioned the recapture tax between the three lots and the remainder of the quarter section for each of the 2 years. The court computed that taxes of $42.76 were delinquent on each of the three lots for the years 1989 and 1990. The court also found that to charge interest before the decree would be inequitable but that the interest was to accrue at the rate of 14 percent after the decree. The court found a lien on each lot and ordered a foreclosure sale of the real estate to satisfy the taxes and interest due against the three lots.

## ASSIGNMENTS OF ERROR

Jansen appeals, and we have reduced its six assigned errors to four. Jansen claims the trial court erred (1) in failing to find the conduct of the Sarpy County agents made it unjust and inequitable for Sarpy County to maintain this action, (2) in finding the additional tax was a lien on the lot, (3) in calculating the dimension of the lots, and (4) in basing its decree upon issues not raised by the petition and answer.

## STANDARD OF REVIEW

This is a foreclosure action and therefore an equitable action. In an appeal of an equity action, an appellate court tries factual questions de novo on the record, reaching a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court will consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Bauermeister v. McReynolds*, 253 Neb. 554, 571 N.W.2d 79 (1997); *Hanigan v. Trumble*, 252 Neb. 376, 562 N.W.2d 526 (1997).

The most significant questions raised in this case are questions of law. When reviewing a question of law, an appel-

late court reaches a conclusion independent of the district court's ruling. *Board of Regents v. Pinzon*, 254 Neb. 145, 575 N.W.2d 365 (1998); *Tapp v. Blackmore Ranch*, 254 Neb. 40, 575 N.W.2d 341 (1998).

## ANALYSIS

*Negligence and Misrepresentation.*

Jansen argues that the negligence or misrepresentation of Sarpy County officials makes it inequitable to allow Sarpy County to foreclose the additional taxes. There is no evidence that any county official made any representation to any representative of Jansen or that Jansen in any way relied upon any records of Sarpy County to its detriment. There is no evidence that Griesmer's activity in checking the records in 1991 was for Jansen or that Jansen in any way relied upon his investigation. Therefore, there is no evidence that any conduct of a county official proximately caused any damage to Jansen. The record shows that the county assessor gave Western Hills notice of the extra assessment in November 1991. At most, the evidence shows that a buyer of lots in Western Hills subdivision might not have learned of the additional taxes if the buyer did not check the assessor's records. The evidence does not establish how this situation affected Jansen, who bought the property in 1993.

Jansen established the technique used by the title examiner for a particular title insurance company. Jansen seems to assume that since that technique did not disclose the information that a buyer of such property needed to protect itself, some county officials neglected a duty. We point out that assessment records are undoubtedly public records and that under Neb. Rev. Stat. § 84-711 (Reissue 1994), any person is entitled to access thereto. If the assessor's office denied Griesmer access to its records, the law was violated. Griesmer might be entitled to redress, but not Jansen, because insofar as we know, Jansen did not seek access to the records. Campbell testified that the Sarpy County assessor's office had never denied people access to the assessment records; however, even if someone was denied access on one or several occasions, this fact would hardly justify canceling a tax levy, particularly for a taxpayer who did not seek access.

Jansen's position seems to assume that if the county does not keep the books and records that enable buyers of real estate to discover delinquent taxes, the county loses its lien for those taxes. We do not agree. The Legislature determines the duties of public officials and the records they must keep. From a review of the applicable statutes, it appears the Legislature long ago provided a system that allows buyers to learn of liens for unpaid taxes. Later in this opinion, we shall review the applicable statute in force from 1991 through 1993 which specified the record on the assessment, levy, and payment of real estate taxes which the Legislature has required public officials to keep. Some of these statutes have been changed, but these changes are updates that do not affect the provisions applicable to the issues of this case.

In *Keenan v. McClure*, 127 Neb. 466, 255 N.W. 784 (1934), the landowner paid taxes on land with a check that was good at the time but was rendered uncollectible when the bank on which the check was drawn closed as insolvent before the treasurer presented the check for payment. The *Keenan* court held the taxes were deemed paid because the treasurer was negligent in presenting the check. Jansen relies on *Keenan* for the proposition that when the negligence of the public official prevents payment of taxes, equity requires the tax foreclosure action be dismissed. We do not agree that *Keenan* supports this proposition. In *Keenan*, the taxpayer would have actually lost the amount of the taxes paid because the treasurer failed to negotiate the check promptly. In the case at hand, there is no evidence Jansen lost anything, even if negligence on the part of some county official is assumed. There is no evidence showing that some act of a county official proximately caused Jansen any damage. The evidence does not show that Jansen, as opposed to Griesmer, relied on an act of a county official or any record kept by the county. The most the evidence in this case shows is that county officials might not have made a record available to Griesmer or might not have kept the records Jansen asserts they should have kept. The correct rule is that the inaction of a county official cannot release or divest a valid tax lien, but only payment or failure of the purchaser of such a lien to foreclose it within the required time cancels a tax lien. *Spiech v. Tierney*, 56 Neb. 514, 76 N.W. 1090 (1898).

In its amended answer, Jansen alleged Sarpy County is estopped from maintaining the action because of errors and irregularities in levying and assessing the tax. Jansen does not point out any errors or irregularities in assessing the additional tax. Insofar as we can discern from the evidence, the county assessor simply followed the statutory procedure in assessing the additional tax, and when that tax was assessed, the entire quarter section or all of the platted lots in Western Hills subdivision were in common ownership. The assessor, therefore, had no reason to assess the additional tax against the individual lots, and under the statutes discussed below, this procedure was sufficient until lots were sold. There is no evidence which would support a finding the additional tax assessed was not validly assessed.

The evidence establishes that on November 1, 1991, the county assessor notified Western Hills of the additional tax assessed against the quarter section due to the disqualification. We observe that as of that date, the quarter section was still under common ownership, notwithstanding the fact that a plat subdividing it had been filed on August 1. On about May 6, when Griesmer testified he checked the record to learn of the possible special use tax liability, the land had not yet been disqualified. We also observe that Jansen did not buy the three lots until December 23, 1993. None of these facts establish that any Sarpy County officials made any representations to Jansen or its representatives, and no officer from Jansen testified that Jansen relied upon any representation of any county official or that Jansen relied on any record of the county. There is no support for Jansen's defense on the basis of misrepresentations or unjust and inequitable conduct of any county official.

*Statutory Procedure.*

Jansen argues that the evidence shows there was and is no record in the Sarpy County treasurer's office showing the tax due against the individual lots and that at no time up to the time of trial could it have paid the taxes, because they were assessed against a quarter section and were not broken out for Jansen's property. Jansen does not allege that it requested the county assessor to break the taxes assessed against the quarter section

down against the individual lots. We conclude that if the statutes were followed, the Sarpy County records would have shown the amount of delinquent tax, that is, the additional tax assessed, against each of the three lots. In that event, Jansen could have paid the tax, and in the event of foreclosure, Sarpy County would have had the necessary evidence to foreclose the taxes actually due against the three lots rather than that which was due from the quarter section in which they are located.

■ Neb. Rev. Stat. § 77-1303 (Reissue 1990) provides that a county assessor shall prepare a list, ledger, or computer file of all taxable lands in the county. The statute further provides that this list shall include in one description all contiguous lots in the same tract or block which belong to one owner. The real estate tax list shall show the name of the owner and shall contain columns in which may be shown the number of acres, the value of the land, the improvements, and the total value. Neb. Rev. Stat. § 77-1613 (Reissue 1990) provides that after the levy is made, the assessor shall transcribe the assessment into a suitable book. The book shall contain several specific columns, and among the columns is to be "a number of columns for delinquent taxes of previous years." Neb. Rev. Stat. § 77-1616 (Reissue 1990) provides that the real estate tax list shall be delivered to the county treasurer by December 1 of each year and further provides: "No informality therein, and no delay in the transmitting of the same after the time above specified, shall affect the validity of any taxes or sales, or other proceedings for the collection of taxes as provided for in this chapter." Neb. Rev. Stat. § 77-1618 (Reissue 1990) provides that as soon as the treasurer receives the tax lists, the treasurer shall enter the amount of unpaid taxes opposite each description. Neb. Rev. Stat. §§ 77-1853 and 77-1854 (Reissue 1990) together provide that any omission on any assessment book is only an irregularity which shall not in any manner invalidate a tax that was levied.

■ Neb. Rev. Stat. § 77-1703 (Reissue 1990) provides in significant part:

> The treasurer shall receive taxes on part of any lot, piece or parcel of land charged with taxes, when a particular specification of the part is furnished. If the tax on the remainder of such lot or parcel of land shall remain

unpaid, the treasurer shall enter such specification in his return so that the part on which the tax remains unpaid may be clearly known.

The above statutes provide a system whereby the records for real estate in the same taxing district under the same owner are kept together as a unit and subdivided when "specification[s] of the [tract are] furnished." This provision applies to contiguous lots.

Under the evidence in this case, the assessor should have kept the records under one name until a different owner acquired part of the tract, or at least until a request was made to have the taxes for a part of the land broken out and separated from the larger tract. Since § 77-1303 requires the tax list to be under the separate owner's name and after the levy is made, the list must show delinquent taxes, the assessor could not follow that statutory direction unless the additional taxes, then delinquent, were broken out and shown against each tract or lot which is not contiguous or under the same ownership. Under the statute, at least absent a request by the owner, this did not need to be done until Jansen acquired title to the three lots in 1993. However, we note that under § 77-1703, this was clearly required to be done at some point before this action was commenced on June 6, 1995.

The treasurer's record in the form of the computer printout is undated but contains a calculation of the interest due and states: "COMPUTATION DTE 29 January 97"; therefore, we presume the printout must be a record for on or after that date. This record is not in accord with the statutory directions because the information is given as to the entire quarter when the real estate had not been in common ownership for at least 5 years. The deputy county assessor's statement that he could not break the taxes out to the individual lots, if intended to imply such a breakout is impossible, is not acceptable. We refuse to believe the information necessary to divide the assessed taxes for a known area of bare farmland into lesser-included areas of any size is not available to the assessor.

■ Section 77-1347 provides that "[u]pon approval of an application, the county assessor shall value the land as provided in subsection (1) of section 77-1344 and shall also enter on the valuation the notation and potential additional tax liability until

the land becomes disqualified for such valuation . . . ." The statute does not clearly state upon which record the assessor shall keep this information, but it can only mean that the potential tax liability shall be entered on the same record where the assessor enters the special use value. This would appear to be the real estate tax list.

If land becomes disqualified, § 77-1348 provides that the assessor shall notify the owner that "there shall be added to the tax extended against the land on the next general property tax roll, to be collected and distributed in the same manner as other taxes levied upon real estate." In what must be one of the most complex sentences ever written, the statute provides that the amount of tax to be added will be the amount that would have been collected during the past 3 years had the special valuation not been used, plus interest at 6 percent on that additional tax from the date it would have been collected. That statute also provides that when the special value is removed as a result of a sale or transfer, the lien for the additional tax attaches the day before the sale or transfer.

The assessor did not follow these statutes, in that the potential additional tax liability was not noted on the tax list, as required by § 77-1347. Also, after the quarter section was subdivided, the entry on the tax list for the individual lots no longer under the same ownership did not disclose the delinquent taxes generated by the recapture as required by the combined effect of §§ 77-1303 and 77-1616. Under §§ 77-1853 and 77-1854, the taxes assessed would not be canceled for failure to keep the required records, but without those entries on the tax records of Sarpy County, the owner of the lots does not have the information necessary to pay the taxes to be paid, and the county does not have the evidence necessary to prove a foreclosure case if they are not paid. A suit to foreclose the delinquent taxes due from the larger tract by foreclosure against the smaller tract is not the solution.

The trial court's solution seems sensible, and when the assessor breaks out the taxes as required, the amount assessed against the three lots will probably not be significantly different from that determined by the trial court. However, this result was not an issue under the pleadings in this case, and the evidence was

insufficient to do anything more than guess at the proper apportionment. We also find no authority for the district court's action when that particular function is undoubtedly a function of the county assessor under § 77-1703.

Since the trial court did not have the authority to apportion the taxes in this foreclosure action, the correct finding is that Sarpy County failed to prove its case and that it failed to prove the taxes it seeks to foreclose were a lien on the three lots. The petition must be dismissed. Accordingly, we reverse the decree of foreclosure entered by the trial court and direct it to dismiss the action without prejudice to the foreclosure of properly determined delinquent taxes.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.