94 P.3d 338 (2004)
122 Wash.App. 470
Joseph D. HOLMES, Jr., an individual, and John F. Kruger, an individual, Respondents,
v.
C.E. LOVELESS, an individual, and Margaret Loveless, his Spouse, and the marital community composed thereof, and Barclay Tollefson, an individual, and Joan Tollefson, his Spouse, and the marital community composed thereof, and the Joint Venture Composed of C.E. Loveless and Barclay Tollefson, d/b/a, Loveless/Tollefson Properties and/or the Nugget Mall, Appellants.
No. 52634-1-I.
Court of Appeals of Washington, Division 1.
July 12, 2004.
*339 David J. Lawyer, Bellevue, WA, for Appellants.
Edwin S. Budge, Erik J. Heipt, Budge & Heipt, PLLC, Seattle, WA, for Respondents.
COLEMAN, J.
The fee a lawyer collects for legal services must be reasonable. Attorney fee agreements are subject to continued review for reasonableness over the course of the agreement. We conclude that the trial court erred in enforcing a contingent fee agreement under which a law firm received 5 percent of the cash distributions from a joint *340 venture in exchange for rendering legal services at a discount. That discount was valued at $8 000 off regular rates; the cash distributions over thirty years have exceeded $380,000. Further enforcement of this agreement cannot be justified on any principled basis. We reverse.

FACTS
Joseph D. Holmes, Jr. and John F. Kruger are retired attorneys and former partners in the Seattle law firm that is now known as Karr Tuttle Campbell. In 1970, Holmes and his law firm began providing legal services to C.E. Loveless, a real estate developer. In 1972, Loveless and Barclay Tollefson, another real estate developer, started a joint venture called "Loveless/Tollefson Properties" to develop The Nugget Mall, a shopping center in Juneau, Alaska.
In a fee agreement dated January 15, 1972, Holmes' law firm agreed to provide legal services to the Loveless/Tollefson joint venture at a discounted rate until June 30, 1974. The discounted rate was intended to cover the law firm's overhead expenses. Thereafter, legal fees would be charged at the full rate. In exchange, Karr Tuttle would receive 5 percent of any cash distributions produced by the joint venture. The agreement contained a conflict of interest provision advising Loveless and Tollefson that their individual interests could be different and that, due to the law firm's prior representation of Loveless, Tollefson should have the agreement reviewed by other counsel. Loveless had entered into several other similar agreements with Karr Tuttle, each pertaining to different joint ventures with different business partners. Loveless initially proposed that Karr Tuttle obtain a 7 percent ownership interest in the joint venture, but Karr Tuttle declined this offer and countered with the 5 percent cash distribution idea. Tollefson had not been a party to such an agreement before the Loveless/Tollefson Properties joint venture was formed. The agreement contained no provision allowing the joint venture to unilaterally terminate the agreement.
The joint venture began making distributions in the early 1980's. Gradually, the shopping center became more successful and it underwent several phases of expansion. In 1986, Loveless and Tollefson raised concerns about the effect of the expansions on the method of calculating cash distributions. When they raised their concerns, Holmes asked another Karr Tuttle partner to assist with the negotiations as a more neutral facilitator. The parties resolved the dispute by entering into a written addendum to the 1972 agreement in which the parties agreed that the joint venture would pay Loveless and Tollefson certain development fees and leasing commissions before the cash distributions were calculated.
The law firm subsequently assigned its interest in the agreement to Holmes and Kruger. By 2001, the joint venture had distributed approximately $380,000 to the law firm and its assignees. At that time, the joint venture notified Holmes that the agreement was no longer enforceable and it terminated payments. Shortly thereafter, it made a large distribution to Loveless and Tollefson. Holmes and Kruger (hereinafter collectively referred to as "Holmes") filed a lawsuit to enforce the agreement and recoup their share of the distribution. On cross-motions for summary judgment, the trial court ruled in Holmes' favor.

ANALYSIS
Appellate review of a trial court's order granting summary judgment is de novo. Ski Acres, Inc. v. Kittitas County, 118 Wash.2d 852, 854, 827 P.2d 1000 (1992). Summary judgment is proper if the pleadings, affidavits, depositions, or admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Meissner v. Simpson Timber Co., 69 Wash.2d 949, 951, 421 P.2d 674 (1966).
A fee agreement that violates the Rules of Professional Conduct (RPC) is against public policy and unenforceable. Simburg, Ketter, Sheppard & Purdy, L.L.P. v. Olshan, 97 Wash.App. 901, 909, 988 P.2d 467 (1999). Deciding whether "an attorneys conduct violates the relevant Rules of Professional Conduct is a question of law." Eriks *341 v. Denver, 118 Wash.2d 451, 457-58, 824 P.2d 1207 (1992). Professional misconduct may also be a basis for denying or disgorging fees. Eriks, 118 Wash.2d at 462, 824 P.2d 1207.
The joint venture's challenge to the fee agreement is premised upon two ethical rules: one governing attorney-client business transactions and another prohibiting excessive fees. Before September 1,1985, the Code of Professional Responsibility (CPR) governed attorney conduct in Washington. Since September 1, 1985, the RPC have regulated lawyer conduct. Thus, both the CPR, which was in effect when the 1972 agreement was made, and the RPC, effective now and when the 1986 addendum was made, are involved in this dispute.
As an initial matter, we conclude that it is appropriate to review the 1972 agreement and the 1986 addendum under the provisions governing business transactions, as well as the provisions for fee agreements. Holmes asserts that the 1972 agreement is not a "business transaction," but this conclusion is not supported by the evidence. Although the law firm declined to obtain an ownership interest in the joint venture, its compensation was directly linked to the joint venture's profits. This is sufficient evidence to conclude that the fee agreement falls within the scope of the business transaction rule.
RPC 1.8 provides:
A lawyer who is representing a client in a matter:
a) Shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
(3) The client consents thereto.
RPC 1.5(a) provides:
(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, the skill requisite to perform the legal service properly and the terms of the fee agreement between the lawyer and client;
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved in the matter on which legal services are rendered and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) Whether the fee agreement or confirming writing demonstrates that the client had received a reasonable and fair disclosure of material elements of the fee agreement and of the lawyer's billing practices.
To some degree, the excessive fee and business transaction provisions overlap when attorneys and clients use business transactions as compensation for legal services. When the fee generated by a business transaction is not fair and reasonable, the business transaction is not fair and reasonable. This is demonstrated in this court's decision in Cotton v. Kronenberg, 111 Wash.App. 258, 44 P.3d 878 (2002), review denied, 148 Wash.2d 1011, 62 P.3d 890 (2003), which analyzed a fee agreement involving the exchange of real property for legal services under RPC 1.8. In Cotton, the attorney agreed to defend a client from criminal charges in exchange for a nonrefundable transfer of real property and a mobile home. This court concluded that the attorney violated the business transaction provision, RPC 1.8, when he was disqualified *342 from the case, but refused to refund the value of the property received.[1] Focusing on the "fair and reasonable" language of RPC 1.8(a)(1), this court held that the attorney's failure to fulfill his obligation to his client, as well as the disparity between the $42,000 value of the real estate and the $10,000 to $30,000 estimate for legal fees based upon hourly rates, rendered the agreement unenforceable. Cotton, 111 Wash.App. at 270-71, 44 P.3d 878.
The Cotton court also noted that the time frame for evaluating the reasonableness of a fee is not restricted to the time of entry into the agreement. It explained:
As Professor Hazard explains in his work on ethics, a fee agreement that may seem fair to a client at the time that the agreement is signed must be reevaluated under the applicable rules when subsequent events alter the circumstances of the relationship. For example, if a client offers an attorney an interest in a fledgling company in exchange for legal representation, and the value of that share in the company unexpectedly increases greatly, the value of the fee may become unreasonably large in proportion to the work performed.
Cotton, 111 Wash.App. at 271-72, 44 P.3d 878. Cotton did not address the excessive fee prohibition of RPC 1.5(a), but the above-cited quotation provides persuasive support for the joint venture's argument that an attorney's ethical obligation to avoid charging an excessive fee is continuous throughout the life of the agreement. In re Swartz, 141 Ariz. 266, 686 P.2d 1236 (1984), cited by the joint venture, shares this view. It held that an attorney's ethical duties require self-monitoring to ensure that there is no violation of DR 2-106, the CPR provision governing fee agreements:[2]
[A] fee agreement between lawyer and client is not an ordinary business contract. The profession has both an obligation of public service and duties to clients which transcend ordinary business relationship and prohibit the lawyer from taking advantage of the client. Thus, in fixing and collecting fees the profession must remember that it is "a branch of the administration of justice and not a mere money getting trade." ABA Canons of Professional Ethics, Canon 12. We hold, therefore, that if at the conclusion of a lawyer's services it appears that a fee, which seemed reasonable when agreed upon, has become excessive, the attorney may not stand upon the contract; he must reduce the fee. What is reasonable and within permissible limits will be determined by the circumstances, including the factors list in DR 2-106.
Swartz, 686 P.2d at 1243. We follow these cases by holding that it is appropriate to hold attorneys to a standard of continued adherence to the rules prohibiting excessive fees. The terms of the 1972 agreement and the 1986 addendum must be evaluated with this in mind.
Holmes argues that Cotton is distinguishable for two reasons. Analyzing Cotton as an excessive fee case, Holmes states that the agreement in Cotton was not contingent, whereas the 1972 agreement was contingent upon the success of the joint venture. Second, the attorney in Cotton never fulfilled his end of the bargain because he was forced to withdraw. In contrast, Karr Tuttle provided discounted legal services for 2½ years as provided in the 1972 agreement.
These factors are certainly appropriate to consider when evaluating the reasonableness of the fee collected from the joint venture, but they do not resolve the question presented, *343 which is whether the 1972 agreement is subject to further enforcement. Although the joint venture does not contend that it is entitled to a refund of fees, it argues continued enforcement of the agreement is not fair and reasonable, even after the contingent nature and successful completion of the work are considered. Holmes argues that the fees are fair and reasonable, relying upon Bauermeister v. McReynolds, 253 Neb. 554, 571 N.W.2d 79 (1997), a Nebraska Supreme Court decision upholding a contingent fee agreement similar to the one here.
In Bauermeister, a joint venture to develop a landfill lacked the funds to pay for legal services, so it offered its lawyer, McReynolds, a royalty to be paid if the landfill proposal succeeded. McReynolds rejected the joint venture's initial royalty fee offer as excessive but agreed to provide services for a royalty fee based upon landfill gate receipts that was one-third of the one originally offered. Bauermeister, 571 N.W.2d at 90. Several years after the landfill opened, one of the parties to the joint venture sought rescission of the agreement and claimed the fees were excessive. By that time, McReynolds had received $900,000 and was expected to receive up to $4 million.
The Nebraska Supreme Court analyzed the parties' agreement and a subsequent assignment under the CPR provisions for business transactions with a client, DR 5-104(A), and for excessive fees, DR 2-106. It concluded that the fee agreement was not a prohibited transaction under DR 5-104(A) because the attorney's and the client's interests did not differ and the client consented to the agreement after full disclosure.[3]Bauermeister, 571 N.W.2d at 91. The objecting party claimed that it was not fully advised of the conflicts of interest when its individual attorney at the time of the joint venture's formation subsequently joined the firm that advised the joint venture. The court rejected this argument because all parties clearly understood that the firm represented the joint venture, not the individuals behind it, and the joint venture consented to the royalty provision upon full disclosure.
The court also analyzed the fee for excessiveness under DR 2-106. The trial court decided that the fee was excessive, but the Nebraska Supreme Court disagreed and cited numerous DR 2-106 factors in support of its conclusion. Those factors were: the slim likelihood of successfully opening the landfill; the large investment of work performed on a contingent basis (worth $250,000) that precluded the attorney from working for two large clients paying hourly fees; the joint venture's inability to afford other counsel; the attorney's special skills in working with local government officials; and the $1.4 million in financial benefits enjoyed by the client. Bauermeister, 571 N.W.2d at 91-92.
The 1972 fee agreement is similar to Bauermeister in some respects. Neither agreement was a classic contingent fee. Instead, compensation was tied to the success of a business venture. Although neither law firm possessed an outright ownership interest, both were entitled to a portion of the profits. In both cases, the attorneys negotiated down from the client's original proposed profit-sharing formula. Furthermore, in Bauermeister, the attorney opined that the likelihood of success was small. Here, while it is uncertain what the parties' expectations were for the joint venture's success, it is not disputed that Loveless and the law firm entered into numerous similar agreements on other joint ventures for which there was no significant revenue generated. Thus, it is reasonable to conclude that the likelihood of success was not great.
But several key differences are apparent. From the outset, the financial burden on Karr Tuttle was minimal compared to the one on the firm in Bauermeister. Rather than defer all compensation until the joint venture began profitable operations, Karr Tuttle received some hourly compensation. In addition, this reduced rate was offered for only 2 1/2 years, after which the full rate was *344 paid. Even after accounting for inflation, the $8,000 out-of-pocket cost to Karr Tuttle was much less than the $250,000 investment made by the firm in Bauermeister. Additionally, unlike the firm in Bauermeister, there is no evidence that the agreement precluded Karr Tuttle from working for other fee-paying clients.
These differences are significant in evaluating whether continued enforcement is reasonable. Holmes may have provided services valuable to the joint venture, but he assumed very little risk in the agreement. Other employment was not precluded, and the discount was only provided for a limited time. His firm still covered its overhead expenses. In comparison with Bauermeister, the return to Holmes has been enormously favorable, and he has not demonstrated any special circumstances, such as particular expertise or unusual demands on his time, that would justify continued enforcement of the agreement. While the 5 percent provision may have been reasonable at the outset given the small percentage it represented of the development's total revenue, at this point over thirty years later, the amount of fee reduction does not justify further enforcement of the agreement. After analyzing the RPC 1.5(a) factors, we agree with the joint venture's contention that the time has been reached when making additional distributions under the agreement would result in an excessive fee.
Another substantial factor that we consider is the lack of a termination date for cash distributions, especially compared with the limited discount period. The joint venture received a discounted rate for only 2 1/2 years, but this agreement could potentially generate distributions to the attorneys and their estates indefinitely. The agreement contains a termination provision that may be exercised at the attorneys' discretion, but the joint venture is not afforded that option. We do not mean to suggest that such a provision would be necessary for the validity of the agreement; however, with the circumstances presented here, the lack of a such a provision has led to an excessive fee situation.
In addition to arguing that the attorney fee will become excessive if the agreement is enforced, the joint venture argues that the 1972 agreement was a prohibited business transaction. The first reason is Holmes' failure to advise the parties to obtain independent review of the agreement. This argument touches on the validity of the agreement from its inception. Although the joint venture does not seek a refund of distributions already paid, even if it had sought this remedy, we would reject this contention. The record does not show that the law firm violated the ethical rules pertaining to entering into business transactions with clients.
Because the agreement was signed in 1972, DR 5-104(A) is the relevant provision. DR 5-104(A) does not require that a lawyer advise a client in all situations to consult independent counsel before entering into a business transaction with the lawyer. See Pollock v. Marshall, 391 Mass. 543, 462 N.E.2d 312, 321 (Mass.1984). Here, Loveless and Tollefson were both experienced real estate developers. Loveless instigated the agreement, believing that it would be beneficial to the joint venture to defer payment of legal fees until it became profitable. As in Bauermeister, there is no evidence that the law firm and the joint venture had differing interests at the time the 1972 agreement was signed. It is clear that the joint venture was the client and that the joint venture consented to the agreement upon full disclosure. Furthermore, the agreement contained a conflict of interest provision specifically advising Loveless and Tollefson of the possibility that their individual interests could conflict. Under these circumstances, we find no violation of DR 5-104(A).
In 1986, when the addendum was signed, RPC 1.8(a) was in effect. RPC 1.8(a) requires lawyers to ensure that clients with whom they transact business have a reasonable opportunity to consult outside counsel. In hindsight, the use of a Karr Tuttle partner to mediate the dispute may not have been advisable, but the record shows that both Tollefson and Loveless considered retaining outside counsel, but decided not to. This is conclusive evidence that they had a reasonable opportunity to consult with counsel.
Tollefson and Loveless also argue that the agreement was unfair because they did not *345 fully understand how the agreement worked, but the evidence does not support this contention. Both appear to have sufficiently understood its provisions to perform the 1972 agreement over several years and to demand certain modifications of it in 1986. Consequently, while there is evidence that Loveless and Tollefson did not like the agreement after the joint venture became profitable, the contention that they did not understand it is not supported by the evidence.[4]
Lastly, Holmes argues that the joint venture waived its right to repudiate the 1972 agreement by entering into the 1986 addendum, but as noted above by the Arizona Supreme Court in Swartz, agreements between attorneys and clients are different from ordinary business contracts. No agreement in violation of the RPC is enforceable. Because fee agreements are subject to continuous review, entering into a negotiated resolution of a fee dispute does not preclude subsequent judicial review where additional fees are generated in the interim.[5]
In sum, we conclude that the 1972 agreement and 1986 addendum are no longer enforceable because the fee would not be reasonable. We reverse and remand for entry of judgment in favor of Loveless, Tollefson, and the joint venture.
WE CONCUR: BECKER and APPELWICK, JJ.
NOTES
[1] The attorney estimated that the hourly fees for the representation through trial could range from $10,000 to $30,000; the property, which he sold shortly after entering into the agreement, was worth $42,000. After the attorney was disqualified, he refused to refund the client any money on the basis that the payment was nonrefundable. The client retained another attorney at a cost of $13,000 to continue the representation.
[2] DR 2-106 prohibits lawyers from entering into an agreement for, charging, or collecting fees that are illegal or "clearly excessive." The factors used to decide whether a fee is clearly excessive are virtually identical to RPC Rule 1.5(a), with the exception that RPC 1.5(a) permits consideration of whether the fee was fixed or contingent, as well as whether the client received fair and reasonable written disclosure of the material elements of the attorney's billing practices.
[3] DR 5-104(A) provides: "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his or her professional judgment therein for the protection of the client, unless the client has consented after full disclosure." The RPC standards for such business transactions are more detailed, but they reflect similar principles.
[4] The only evidence of misunderstanding comes from Loveless' claim that he failed to read the agreement carefully. "Where a party has signed a contract without reading it, that party cannot successfully argue that mutual assent was lacking as long as the party was not deprived of the opportunity to read the contract, the contract was plain and unambiguous, the party was capable of understanding the contract, and no fraud, deceit, or coercion occurred." Yakima County (West Valley) Fire Prot. Dist. 12 v. City of Yakima, 122 Wash.2d 371, 389, 858 P.2d 245 (1993). For reasons not known, Loveless did not sign the 1972 agreement, but Tollefson did on the joint ventures behalf. Loveless did sign the 1986 addendum, and thereby ratified the 1972 agreement. Without a showing of fraud or deceit, Loveless claim must fail.
[5] Given the indefinite duration of this agreement, even if we had found that continued enforcement would not violate the prohibition on excessive fees, the joint venture would not be precluded from challenging the agreement later if it generated additional compensation for the attorneys.