MEREK RUBIN vs. JOHN E. MURRAY, JR., & others.[1]

No. 09-P-1676.

Norfolk. September 17, 2010. - March 16, 2011.

Present: GRAHAM, KATZMANN, & VUONO, JJ.

*Fiduciary. Attorney at Law,* Fiduciary duty, Transaction with client, Compensation. *Corporation,* Stockholder, Officers and agents, Stock, Valuation of stock, Derivative action. *Contract,* Construction of contract. *Limitations, Statute of.*

In a civil action brought against a close corporation and three of its officers and directors by a minority shareholder (plaintiff) who formerly served as corporate counsel, the record supported the trial judge's conclusion that an earlier fee agreement between the plaintiff and the defendants, in which the defendants agreed to transfer to the plaintiff ten percent of the corporation's stock as partial payment for his legal services, was arrived at fairly and equitably and was therefore enforceable [69-73]; further, nothing in the record warranted disturbing the judge's conclusion that the fee was not excessive [73-75].

In a civil action brought by a minority shareholder (plaintiff) of a close corporation, alleging that three officers and directors of the corporation paid themselves excessive compensation and deprived the plaintiff of his share in the corporation's profits, there was no merit to the defendants' argument that the corporation's amended articles of organization either prohibited the plaintiff's challenge to excessive compensation or barred his right to share in the profits. [75-76]

In a civil action brought by a minority shareholder (plaintiff) of a close corporation, in which the plaintiff alleged that three officers and directors (individual defendants) of the corporation paid themselves excessive compensation and deprived the plaintiff of his share in the corporation's profits, the judge, in ordering the individual defendants to reimburse the corporation for amounts over and above what the judge determined to be their reasonable compensation for the time period in question, to be redistributed among all shareholders according to their ownership interests, did not rely on speculative or insufficient evidence in determining what amounts constituted the individual defendants' reasonable compensation for the relevant years [76-80] and did not abuse his discretion in ordering a derivative rather than direct remedy [80-81].

In a civil action brought by a minority shareholder (plaintiff) of a close corporation, in which the plaintiff alleged that three officers and directors (individual defendants) of the corporation paid themselves excessive compensation and

---

[1]Stephen P. Hopkins, Paul C. Ryan, and Olympic Adhesives, Inc.

deprived the plaintiff of his share in the corporation's profits, the judge, in permitting the plaintiff to recover his share of excess compensation, did not err in treating the plaintiff's claim as one for money had and received and applying the six-year statute of limitations applicable to contract actions [81-82]; further, the judge's finding that the individual defendants had committed a breach of their fiduciary duty of good faith equated to a finding of lack of good faith regarding the corporation's best interest and supported the judge's order that the individual defendants repay the corporation amounts paid for their attorney's fees in this action [82-83].

CIVIL ACTION commenced in the Superior Court Department on March 20, 2000.

The case was heard by *Patrick F. Brady*, J.

*Janet Steckel Lundberg* (*Vincent J. Pisegna & Susan A. Hartnett* with her) for the defendants.

*Michael R. Gottfried* for the plaintiff.

KATZMANN, J. The corporate defendant, Olympic Adhesives, Inc. (Olympic), and individual defendants John E. Murray, Jr., Stephen P. Hopkins, and Paul C. Ryan, controlling shareholders of Olympic,[2] appeal from a Superior Court judgment in favor of the plaintiff, Merek Rubin, a minority shareholder and Olympic's former corporate counsel — who had acquired stock in Olympic as partial payment for legal services rendered to the individual defendants — on his claim that the individual defendants paid themselves excessive compensation and deprived Rubin of his share in Olympic's profits. Following a jury-waived trial, the judge ordered the individual defendants to reimburse Olympic for amounts over and above what he determined to be their reasonable compensation for the years 1995 through 2005, to be redistributed among all the shareholders according to their ownership interests. We affirm.

We summarize the facts from the judge's findings in his August 17, 2005, memorandum of decision and order, which were fully supported by the record, and which we augment somewhat, here and in our discussion, from the undisputed evidence in the record. Olympic is a closely held Massachusetts corporation, formed by the individual defendants in March, 1975, to manu-

---

[2] We refer herein to Murray, Hopkins, and Ryan collectively as the individual defendants; to Olympic Adhesives, Inc., the corporate defendant, as Olympic; and to the individual defendants and Olympic together as the defendants.

facture and distribute industrial adhesives. Originally, the individual defendants were Olympic's sole shareholders; they are also Olympic officers, directors, and employees. Prior to 1975, the three individual defendants worked for Nicholson and Company, Inc. (Nicholson), an adhesive company controlled by John Murray, Sr. (Murray, Sr.), who is Murray's father and Hopkins's grandfather. Murray and Hopkins were also Nicholson shareholders. In 1975, a dispute between Murray, Sr., and the individual defendants, concerning voting rights and control of Nicholson, prompted the individual defendants to leave Nicholson and form Olympic. Upon their departure, Murray, Sr., sued the individual defendants for breach of fiduciary duty, along with other claims.

Rubin is an attorney specializing in corporate and tax matters. Prior to 1975, he had performed estate planning work for both Hopkins and Murray. When the individual defendants left Nicholson, they sought Rubin's advice in forming Olympic and in defending the Nicholson lawsuit. Rubin recommended they hire Edward Barshak, a trial attorney. Barshak successfully defeated Nicholson's motion for a preliminary injunction against Olympic. Rubin conducted settlement negotiations with Nicholson over several months, obtaining dismissal of the case and promissory notes for the purchase of Murray's and Hopkins's shares in Nicholson. Rubin spent approximately 500 hours on the Olympic start-up and the Nicholson litigation and settlement, and the individual defendants were enormously grateful. They had difficulty paying Rubin for his legal services, however, having invested their cash in the start-up of Olympic.

In October, 1975, Rubin met with the individual defendants to discuss his unpaid fee. At that meeting, Rubin proposed that they pay his fee in three parts: a cash payment of $40,000, a percentage of the notes from Nicholson to Murray and Hopkins to purchase their Nicholson shares, and nonvoting stock equal to ten percent in Olympic.[3] Rubin suggested the individual defendants consult another attorney to review his fee proposal for fairness. They chose not to, as they trusted Rubin and were satisfied with the proposal. At that time, Olympic's accountant valued Rubin's proposed ten percent interest in Olympic at $2,750.

---

[3] It was understood that the cash payments, if any, would be paid over the next several years.

Rubin drafted the necessary documents to create a new class of nonvoting stock, designated class B common stock, identical in all respects to the individual defendants' class A common stock except for its nonvoting status. In particular, Olympic's articles of organization were amended to provide, in relevant part, the following:

> "Shares of Class A Common Stock and Class B Common Stock shall be identical in all respects, except that shares of Class B Common Stock shall not possess or enjoy any voting rights or powers, and no holder of Class B Common Stock shall be required to receive notice of any meetings of stockholders of the corporation. Holders of Class A Common Stock shall have exclusive voting power and shall be entitled to one vote in respect of each share of Class A Stock issued and outstanding."

At no time did the parties indicate that nonvoting stock was not entitled to receive dividends, if and when declared. The articles of amendment were approved by the individual defendants.[4]

In 1976, Olympic adopted an employee profit-sharing plan, setting aside twenty percent of the net operating income, before taxes, for distribution. In 1977, Olympic began to make a profit, and Rubin advised the individual defendants to distribute the profit among themselves, as a merit bonus, to avoid paying additional taxes under Olympic's C-corporation tax status. As a result, Murray received a bonus that year of $5,000, and Hopkins and Ryan each received $4,000. The individual defendants continued to declare bonuses to themselves thereafter.

In 1978, Rubin encountered personal financial difficulties and borrowed $20,000 from Olympic, pledging his Olympic stock as security. Rubin paid interest on the note but did not pay the note when due, and Olympic extended it several times. In 1994, Olympic forgave the note because of the long-standing relationship between the individual defendants and Rubin. Rubin retained his shares in Olympic.

In April, 1981, Murray replaced Rubin with new general counsel. Murray had been tried for and convicted of Federal

---

[4]For simplicity, we will refer to the three-part arrangement for payment of Rubin's legal fees as the 1975 fee agreement.

customs violations in 1980, and faced with the possibility that Olympic's assets might be seized, he decided that Olympic needed the services of a law firm with broader experience. As a result, Rubin performed no legal services for Olympic after 1981, though he continued to handle personal legal matters for Hopkins and Ryan. Each year Rubin received Olympic's financial statements and was invited to the annual shareholder meetings. Rubin attended occasionally, and he continued to see the individual defendants socially.

Olympic continued to do well. In 1990, Olympic adopted a restated profit-sharing plan, whereby one-third of the net operating income went to a fund that would be distributed to employees, including the individual defendants. Twice a year, after calculating amounts for the profit-sharing plan, the individual defendants also paid themselves what they referred to as additional compensation, representing what the judge described as "a very high percentage" of Olympic's net profits.[5] Between 1990 and 2005, this additional compensation totaled $14,925,000, which was, again, in addition to the individual defendants' salaries and their share of the employee profit-sharing fund, and which the judge found was allocated among the defendants according to their stock ownership.

On December 11, 1998, Rubin wrote to Murray, complaining that the individual defendants "were effectively taking disguised dividends from the company with no pro rata distributions made to [him]." At that point, Rubin's accountant was permitted to review Olympic's records and tax returns, and on January 26, 2000, Rubin's attorney made a formal demand of Olympic's board of directors pursuant to Mass.R.Civ.P. 23.1, 365 Mass. 768 (1974).

Rubin filed this action on March 15, 2000, claiming individually and derivatively that the three individual defendants had paid themselves excessive compensation, in violation of their fiduciary duty to Rubin as a minority shareholder.[6] The case was tried over nine days and the judge ruled for Rubin. The

---

[5]The judge found the percentage of Olympic's net profits paid to the individual defendants as additional compensation, after profit sharing, was approximately seventy-five percent in 1990, and grew to between ninety-two percent and ninety-seven percent from 1995 to 2005.

[6]Rubin filed a supplemental complaint on May 16, 2005, alleging that the excessive compensation was ongoing.

judge ordered the three individual defendants to repay to Olympic $5,806,000, the amount he found to be in excess of their reasonable compensation for the years 1995 to 2005, together with interest, to be redistributed among all the Olympic shareholders after taxes. The judge further ordered the three individual defendants to repay Olympic for their legal fees, which Olympic had paid on their behalf.

The defendants appeal. Their arguments are directed principally at whether Rubin was entitled, under the 1975 fee agreement, to challenge the individual defendants' compensation, and whether the remedy ordered by the judge was supported by the evidence and the law.

*The 1975 fee agreement.* 1. *Attorney-client transactions.* The defendants first argue that Rubin has no right, either as the individual defendants' former attorney or as an Olympic shareholder, to challenge the individual defendants' compensation. They maintain that the 1975 fee agreement should not be enforced because Rubin breached his fiduciary duty, as the defendants' attorney, by failing to disclose his potential conflict of interest between his duties as their attorney and his rights as a minority shareholder in Olympic. The judge found that Rubin's disclosure was adequate and that the transaction was fair.[7]

In analyzing whether the fee arrangement should be enforced, the judge was guided by the principles set out in *Pollock* v. *Marshall*, 391 Mass. 543, 555-559 (1984). In that case, the court upheld the attorney-client business transaction even though the attorney never advised his client to seek independent legal

---

[7]As an initial matter, the parties dispute whether the defendants' attempt to challenge or undo the 1975 transaction is properly before us, as the defendants' motion to add a claim for rescission was denied, and the denial was not included in their notice of appeal. This court may refuse to enforce a contract or recognize a transaction entered into by an attorney that violates the law or public policy, including the policy expressed in the Massachusetts Rules of Professional Conduct and their predecessor. *McLaughlin* v. *Amirsaleh*, 65 Mass. App. Ct. 873, 880-885 (2006). This principle may be applied to the situation where an attorney seeks to enforce a fee contract which the court finds was the product of overreaching and was excessive and unreasonable as a matter of law. *McInerney* v. *Massasoit Greyhound Assn., Inc.*, 359 Mass. 339, 353 (1971). Where such important policy considerations are at stake, it is not necessary that the parties raise the issue in their pleadings or that the judge address the issue below. *McLaughlin* v. *Amirsaleh, supra* at 880 n.11.

counsel, because the court concluded that the presumed influence of an attorney over the client in such transactions may be "neutralized by independent advice given to the client *or by some other means.*" *Id.* at 556-557, quoting from *Barnum* v. *Fay*, 320 Mass. 177, 181 (1946). See *Widett & Widett* v. *Snyder*, 392 Mass. 778, 781-782 (1984) (applying *Pollock* v. *Marshall* to case where client gave attorney mortgage to secure amounts due for legal services rendered).

The judge here carefully considered the evidence bearing on Rubin's disclosure, the individual defendants' understanding of the transaction, and the nature of the transaction. With respect to Rubin's disclosure, the judge credited Rubin's testimony that he explained to the individual defendants that his stock would be the same as theirs, except that he would not have the right to vote, and that they should obtain independent legal advice regarding the transaction's fairness. The judge further credited Rubin's testimony that the individual defendants were satisfied with the proposal and chose not to seek independent legal advice.[8]

The judge found that Rubin's disclosure was adequate in light of the experience of the defendants and the nature of the transaction. Specifically, he found that "[t]he plaintiff did not fail to disclose anything of significance which the defendants, as intelligent and experienced businessmen, did not already know with respect to their obligations as shareholders." It was appropriate that the judge take into account the knowledge and sophistication of the individual defendants concerning shareholder rights and obligations in assessing the adequacy of Rubin's disclosure. *Pol-*

---

[8]The defendants argue that Rubin's disclosure violated S.J.C. Rule 3:07, Canon 5, DR 5-104(A), 359 Mass. 815 (1972), in effect at the time of the 1975 transaction, providing that: "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure." The judge determined that Rubin disclosed all that was required by the rules in existence at the time of the transaction. Moreover, a violation of a disciplinary rule, while it may be some evidence of an attorney's negligence, does not in itself constitute an actionable breach of duty to a client. *Fishman* v. *Brooks*, 396 Mass. 643, 649-650 (1986). We note that this level of disclosure would not be sufficient under the current formulation of the Massachusetts Rules of Professional Conduct, which now *requires*, among other things, written disclosure and the client's written consent. Mass.R.Prof.C. 1.8(a), 426 Mass. 1338 (1998).

*lock* v. *Marshall, supra* at 557. See, e.g., *Widett & Widett* v. *Snyder*, 392 Mass. at 782; *McCray* v. *Weinberg*, 4 Mass. App. Ct. 13, 18 (1976). See generally *Cambridge Trust Co.* v. *Hanify & King Professional Corp.*, 430 Mass. 472, 477 (1999); *Graves* v. *Hutchinson*, 39 Mass. App. Ct. 634, 643-644 (1996). Compare *Israel* v. *Sommer*, 292 Mass. 113, 124 (1935) (no finding of fact that eighty year old client knew of and understood all aspects of trust agreement giving indefinite rights to his attorney). Similarly, the judge properly considered that the individual defendants previously had been minority shareholders in Nicholson.[9] Our review of the record revealed ample support for the judge's finding that the individual defendants were well versed in the basic rights and duties of shareholders in close corporations.

In light of the judge's findings regarding the individual defendants' knowledge and experience in corporate matters, we think he properly rejected the defendants' argument that Rubin was required to disclose to the individual defendants that it would be a breach of their fiduciary duty if they paid nearly all of the corporation's profits to themselves and paid Rubin nothing, and that he could sue them for such breach. Murray, Olympic's president and treasurer, specifically testified that he knew that the majority owed minority and nonemployee shareholders a fiduciary duty, that employee shareholder compensation had to be fair to nonemployee shareholders, that a minority shareholder had a right to share in the profits, and that this was true whether the shares were voting or nonvoting and whether the shareholder was an employee of the corporation or a nonemployee. The judge reasonably found from the evidence that the individual defendants possessed the requisite knowledge and sophistication to understand the "basic proposition that a shareholder is entitled to share in the profitability and value of the enterprise." See

[9]According to the record, Murray and Hopkins held both voting and nonvoting stock in Nicholson. Murray testified that, while still at Nicholson, he and his father, Murray, Sr., had a dispute over control of the company, and in 1975, his father wanted to change the designation of control under a prior stock trust agreement that gave Murray the right to run the company. When Murray, Sr., sued the defendants, Rubin assisted in defending the lawsuit and negotiating a settlement, which involved creating a voting trust agreement for the defendants' Nicholson shares, whereby Murray and Hopkins gave up voting rights in exchange for the right to pursue their own business with Olympic.

generally *Cambridge Trust Co.* v. *Hanify & King Professional Corp.*, 430 Mass. at 477 (in assessing sophistication of clients in understanding attorney's disclosure regarding contingency fee agreement, judge could consider what client knew or should have known).

The defendants urge us to rely on *Goldman* v. *Kane*, 3 Mass. App. Ct. 336, 341-342 (1975), to hold Rubin to more exacting disclosure requirements. But in that case, the transaction itself was found to be so fundamentally unfair that the attorney's disclosure, which included his own recommendation against the deal, could not redeem the arrangement. The same was found in *Israel* v. *Sommer*, 292 Mass. at 123-124, again involving a transaction so fundamentally unfair that the attorney's explanation of the deal to the client did not suffice. See *Duggan* v. *Gonsalves*, 65 Mass. App. Ct. 250, 257-258 (2005) (fundamentally unsound transaction of attorney representing clients in foreclosure proceeding and then purchasing their property for himself).

Here, in contrast, the judge found the transaction to be fair, and the evidence fully supported that view. He found that Rubin was entitled to be paid for the legal services he had provided; that the agreed-upon value of the stock at the time of transfer, along with the cash payment and Nicholson notes, represented a fair payment for his services; and that the individual defendants understood and were pleased with the option to pay part of Rubin's fee in stock rather than cash. See, e.g. *Pollock* v. *Marshall*, 391 Mass. at 557 ("the transactions were found, as a matter of fact, not to have involved any overreaching or undue influence by the plaintiffs"). Furthermore, the judge observed that nothing in the law prohibited the payment of legal fees, for services rendered, in shares of stock, and the defendants do not contest the point.[10] See Mass. Bar Assn. Comm. on Professional Ethics, Op. No. 76-16 (1976) ("It is not improper for a lawyer to accept shares of stock in a corporation as compensation" for legal services). From the testimony, it was plain that all parties

[10]The permissibility of accepting stock in lieu of legal fees is well supported. Mass. Bar Assn. Comm. on Professional Ethics, Op. Nos. 76-16 (1976), 81-11 (1981). See ABA Standing Comm. on Ethics and Professional Responsibility, Formal Op. 00-418 (July 7, 2000); Association of the Bar of the City of N.Y., Formal Opinion 2000-3; D.C. Bar Legal Ethics Comm. Op. No. 300 (2000).

understood, at the time of the stock transfer to Rubin, the risk to Rubin that the stock might be worthless, and all parties understood that Rubin, as a minority stockholder, would be entitled to share in the profits should the venture succeed.

Based on this record, we discern no fundamental unfairness in the transaction involving the transfer to Rubin of ten percent of the stock in Olympic as partial payment for his legal services. We conclude that the judge appropriately applied the factors set out in *Pollack* v. *Marshall, supra,* and that the record supported his conclusion that the 1975 fee agreement was arrived at fairly and equitably.

2. *Second look for reasonableness.* The defendants further argue that the 1975 fee agreement should be subject to a second look for reasonableness. In particular, they urge that we look to the current value of the stock in determining what was a reasonable fee for legal services performed and completed in 1975. However, the policy arguments put forth by the defendants that permit judicial re-examination of contingent fee agreements, or fee agreements that involve ongoing legal services, are not implicated here. See, e.g., *McInerney* v. *Massasoit Greyhound Assn., Inc.,* 359 Mass. 339, 352 (1971); *Holmes* v. *Loveless,* 122 Wash. App. 470, 473 (2004).

Contingent fee agreements, because the outcome and the extent of the legal services are unknown at the time of the bargain, must comply with certain strict requirements to ensure fairness. See, e.g., *R.W. Granger & Sons, Inc.* v. *J & S Insulation, Inc.,* 61 Mass. App Ct. 92, 96-100 (2004).[11] Because contingency fees are negotiated at a time of significant uncertainty, and with the possibility that the client lacks true bargaining power, contingent fee agreements may be reviewed for reasonableness once the attorney's services are completed

[11]Contingent fee agreements currently are governed by Mass.R.Prof.C. 1.5, as amended, 432 Mass. 1301 (2000), which sets out a series of requirements that must be included in those agreements, including, for example, the contingency upon which fees will become owing and the method by which the fees and other costs are to be determined. In 1975, S.J.C. Rule 3:14, 351 Mass. 731 (1967), defined a contingent fee agreement as "an agreement, express or implied, for legal services of an attorney . . . under which compensation, contingent in whole or in part upon the successful accomplishment or disposition of the subject matter of the agreement, is to be an amount which either is fixed or is to be determined under a formula."

and the outcome known. See *id.* at 101 n.10. See also *Gagnon v. Shoblom*, 409 Mass. 63, 67 (1991).

Those concerns are not present here. Rubin was seeking payment for work already performed at the time the parties entered into the 1975 fee agreement, and thus the hours expended and the results achieved were known. All parties agreed to the amount to be paid[12] and to the value of the Olympic shares as part of that payment, and the judge found those amounts to be reasonable for the services provided. Moreover, as the record makes clear, these individual defendants were not naive and did not lack in bargaining power. Contrast *McInerney* v. *Massasoit Greyhound Assn., Inc.*, 359 Mass. at 352 (contingent fee agreement requiring wife in divorce action to pay her attorney monthly stipend for the rest of her life, and to transfer percentage of whatever stock her attorney recovered in divorce action, held patently unfair). See also *Holmes* v. *Loveless*, 122 Wash. App. at 481 (fee agreement provided attorneys receive five percent of profits from client's business in exchange for ongoing legal services, regardless of amount of services actually provided, without end date for payments, and without establishing ownership interest for attorneys).

Finally, we note that contrary to the "second look for reasonableness" urged here by the defendants, various authorities support the valuation of stock issued in lieu of legal fees at the time that it is issued. ABA Standing Comm. on Ethics and Professional Responsibility, Formal Op. 00-418 (July 7, 2000); Association of the Bar of the City of N.Y., Formal Opinion 2000-3; Klein, No Fool for a Client: The Finance and Incentives Behind Stock-Based Compensation for Corporate Attorneys, 1999 Colum. Bus. L. Rev. 330. Any windfall that the attorney may receive from valuing the asset at the time that the fee is set is a "reward [that] stems from the investment risk accepted." Association of the Bar of the City of N.Y., Formal Opinion 2000-3. As a practical matter, adopting a "second look" at stock issued in lieu of legal fees is problematic because there is no natural point

---

[12]Here, the $40,000 cash payment, combined with stock valued at $2,750, and the Murray, Sr., notes, all of which the judge valued at approximately $53,000 at the time, was deemed reasonable payment for the 500 hours Rubin already had expended on the defendants' behalf.

at which to review the value of the stock. By contrast, an approach that evaluates the stock at the time that it was issued is sensible and practicable.

While it can be very difficult to accurately value a start-up business, Rubin made efforts to determine the value of the stock that he was requesting in lieu of fees. In order to place a monetary value on the stock, he sought the advice of Olympic's accountant, who indicated that the defendants had contributed $25,000 for 100 percent interest, six months earlier, so therefore he thought it made sense to value Rubin's ten percent interest at $2,750. The defendants do not challenge the fact that $2,750 was a fair assessment of the value of a ten percent interest in Olympic in 1975.

The judge here found that the cash portion of Rubin's compensation ($40,000) was inadequate to "compensate the plaintiff fully and fairly" and that because of this Rubin asked for an additional ten percent stock interest. Recognizing that the "value of Olympic's stock at the time of issuance was highly problematical" and "[t]he enterprise could easily have failed," the judge found that "[i]t cannot be said that the fee was excessive." We are presented with no persuasive argument to disturb that conclusion.

3. *Interpreting the articles of amendment.* We also are unpersuaded by the defendants' argument that the articles of amendment, specifically the language that "shares of Class B Common Stock shall not possess or enjoy any voting rights or powers," should be interpreted to deny Rubin not only voting rights, but all other powers associated with stock ownership. According to the defendants, the language means that Rubin has no powers in connection with his stock, and is not entitled to sue or to share in the profits unless and until the company was sold. No reasonable reading of the phrase, taken in context, permits that interpretation.

The parties agree that Olympic's corporate documents are to be construed according to principles of contract interpretation. We rely on the following: "In interpreting a contract, '[t]he objective is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose.' " *Downer & Co., LLC* v. *STI Holding, Inc.*, 76 Mass.

App. Ct. 786, 792 (2010), quoting from *Sullivan* v. *Southland Life Ins. Co.*, 67 Mass. App. Ct. 439, 442 (2006). "The words of a contract must be considered in the context of the entire contract rather than in isolation." *General Convention of the New Jerusalem in the United States of Am., Inc.* v. *MacKenzie*, 449 Mass. 832, 835 (2007). *Starr* v. *Fordham*, 420 Mass. 178, 190 (1995). See *MacDonald* v. *Hawker*, 11 Mass. App. Ct. 869, 873 (1981), quoting from *Crimmons & Pierce Co.* v. *Kidder Peabody Acceptance Corp.*, 282 Mass. 367, 375 (1933) ("The intent of the parties must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part").

Viewing the contested term "voting rights or powers" in context, we observe that both the preceding clause, plainly stating that Rubin's class B shares are "identical in all respects" as the individual defendants' shares, and the final sentence, employing the phrase "voting powers," make clear that "voting" modifies both "rights or powers." See, e.g., *Downer & Co., LLC* v. *STI Holding, Inc.*, 76 Mass. App. Ct. at 792 (plaintiff's interpretation of contested language only possible if taken out of context and read in isolation).[13] The only reasonable interpretation in this context is that the term "voting rights or powers" refers to the nonvoting character of Rubin's shares. Accordingly, we hold that the amended articles of organization neither prohibit Rubin's challenge to excessive compensation nor bar his right to share in the profits.

*Remedy.* 1. *Evidentiary support for reasonable compensation.* The judge found that the individual defendants' compensation for the years at issue was unreasonably high, noting that from 1995 to 2005, they paid themselves nearly all the profits that remained after payments under the employee profit sharing plan. See, e.g., *Crowley* v. *Communications for Hosps., Inc.*, 30 Mass. App. Ct. 751, 756-757 (1991) (compensation to majority shareholders of large percentage of corporation's profits deprived

---

[13]A review of statutory usage of the "voting rights" and "voting powers" shows that both terms are used interchangeably. See, e.g., G. L. c. 156B, § 77; G. L. c. 156D, §§ 6.01 & 6.03 ("voting rights"). See also G. L. c. 164, § 6; G. L. c. 175, § 66C; G. L. c. 155, § 18; G. L. c. 156, §§ 14, 32 & 41 ("voting powers").

minority shareholders of their equity). Nevertheless, he rejected Rubin's argument that all amounts over and above the individual defendants' salaries and profit-sharing payments were excessive. The judge pointed out that the individual defendants had set their salaries at relatively low levels and that they were entitled to reasonable bonuses in addition to their other compensation. Accordingly, the judge undertook to determine the reasonable compensation for top executives in a firm of Olympic's size and character, in order to determine the excess amounts that should be returned to the corporation. The defendants claim that the judge relied on speculative and insufficient evidence in determining what amounts constituted their reasonable compensation for the relevant years.

"The question of what is reasonable compensation for the performance of executive duties by an officer of a corporation is one of fact." *Black* v. *Parker Mfg. Co.*, 329 Mass. 105, 116 (1952).[14] See *Crowley* v. *Communications for Hosps., Inc., supra* at 756. As such, its resolution is subject to review under the clearly erroneous standard. See generally *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 541 n.47 (1997) ("a finding of valuation is subject to review under the 'clearly erroneous' standard, and we will accept a judge's findings based on the evidence or a reasonable inference from it"); *Haskell* v. *Versyss Liquidating Trust*, 75 Mass. App. Ct. 120, 125-126 (2009). Among appropriate considerations for the judge, "[a] salary must bear a reasonable relation to the officer's ability and to the quantity and quality of the services he renders." *Black* v. *Parker Mfg. Co.*, 329 Mass. at 116. In addition, compensation may be based to some extent on the profits resulting from their efforts. *Id.* at 117.

---

[14]The defendants complain that the burden of proving the reasonableness of the compensation was wrongly placed on them. The burden is on the directors, who set their own compensation, to prove their salaries were fair and did not result in harm to the corporation. *Charlette* v. *Charlette Bros. Foundry, Inc.*, 59 Mass. App. Ct. 34, 43 (2003). The defendants argue, however, that the burden to prove what is reasonable compensation should shift to Rubin, if and when the defendants fail to prove that the salaries were reasonable. See, e.g., *Samia* v. *Central Oil Co. of Worcester*, 339 Mass. 101, 128 (1959) ("initial burden" to prove reasonableness of payments to directors and officers rested on them). Rubin provided sufficient evidence to support the judge's findings of reasonable compensation so that we need not reach the burden-shifting issue. See *Haskell* v. *Versyss Liquidating Trust*, 75 Mass. App. Ct. 120, 127 n.14 (2009).

It was within the judge's discretion to accept the testimony of Rubin's expert financial analyst, Howard Gordon, regarding the individual defendants' reasonable compensation and the proper factors to consider in light of salaries paid at comparable companies. *Sugarman* v. *Sugarman*, 797 F.2d 3, 11 (1st Cir. 1986). Gordon was qualified as an expert, without objection, on the subject of fair owner compensation in closely held businesses. According to his testimony, he relied on two authoritative publications utilized in the business valuation industry to assess officer compensation: the Officers Compensation Survey and the Risk Management Associates Statement Studies. Gordon identified certain factors to assist in determining the defendants' reasonable compensation, including the individual defendants' roles in Olympic's successful thirty-year history, the growth in Olympic's annual sales, Olympic's gross margin and profitability (were it not for the profit taken by the defendants as additional compensation), and the special skills of the individual defendants that likely contributed to Olympic's success.

The judge relied on Gordon's analysis but did not adopt Gordon's proposed salary figures. Gordon opined that the individual defendants' compensation was more than twice what it should have been, based on comparable material manufacturing companies and officers' pay. The judge, relying on evidence that officer compensation fell between approximately four percent to seven percent of net sales for comparable companies for the years 2001 to 2004, and adding his own success premium based on the individual defendants' significant abilities and contributions, determined that fair and reasonable compensation for them was approximately ten percent of Olympic's average annual net sales. See, e.g., *Sugarman* v. *Sugarman*, 797 F.2d at 13. Determining reasonable compensation based on a percentage of net profits, with his own adjustments for performance, was a permissible exercise of the judge's discretion. *Black* v. *Parker Mfg. Co.*, 329 Mass. at 117. This amount the judge then confirmed with evidence of the average compensation for top officers in comparable firms for 2001 to 2004. See, e.g., *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 483 (1991) (judge's award fell within the range of values to which the parties' experts testified).[15]

---

[15]The defendants argue that no evidence was presented to support the finding

The judge was not required to credit the testimony of the defendants' expert, Thomas Quinn, that the additional compensation paid to the individual defendants reflected reasonable salaries for their positions. See *Haskell* v. *Versyss Liquidating Trust*, 75 Mass. App. Ct. at 125-126. Quinn relied on the fact that the Internal Revenue Service had not audited Olympic's tax returns, as he would expect had the additional compensation been unreasonable; it was for the judge to determine what weight, if any, to accord the point. See *Sugarman* v. *Sugarman*, 797 F.2d at 11. The same is true as to Quinn's testimony that the duties undertaken by the individual defendants and the success of Olympic supported their compensation. *Ibid.* The judge could appropriately take into account that Murray, Olympic's president and treasurer, was vague in identifying a basis for determining distribution of additional compensation among the individual defendants and, when pressed by the judge, testified that Olympic used no numerical factors to set or apportion the additional compensation. The judge found it significant that amounts paid to the individual defendants in additional compensation corresponded to the percentage of their stock ownership, rather than to any enumerated performance factors bearing on the distribution, and he was entitled to reject Murray's explanation that the correlation was just a coincidence.

"[I]t was appropriate for the court to question the reasonableness of [the defendants'] salary under these circumstances and to accept expert testimony regarding the excessiveness of that salary." *Sugarman* v. *Sugarman*, 797 F.2d at 12. The judge was entitled to make a reasoned choice from the differing opinions of the experts. *Fechtor* v. *Fechtor*, 26 Mass. App. Ct. 859, 864-865 (1989). We see no error in the judge's reliance on portions of Rubin's expert's testimony in making his own determination of reasonableness, see *Haskell* v. *Versyss Liquidating Trust*, 75 Mass. App. Ct. at 127, nor do we think the evidence

---

of excessive compensation for the years 1995 to 2001. However, the individual defendants' positions within the company, their annual compensation, and the annual net profits of the company were in evidence, and the judge calculated reasonable compensation based on a percentage of the company's net profits over the ten-year period, applying the same formula for all the years in question. Compare *Sugarman* v. *Sugarman*, 797 F.2d at 9 (founding stockholder's salary suddenly doubled in one year, despite his absence from the company due to illness).

relied upon was insufficient or speculative. See, e.g., *Analogic Corp.* v. *Board of Assessors of Peabody*, 45 Mass. App. Ct. 605, 608 (1998) (opinion of appraiser who "was familiar with the subject property, the comparables he considered, and the economic conditions of the area" did not constitute impermissible guesswork). Any weaknesses identified by the defendants in Gordon's analysis or the information upon which his opinion relied went to the weight of his testimony and was a matter for the judge to decide. See *Denneny* v. *Zoning Bd. of Appeals of Seekonk*, 59 Mass. App. Ct. 208, 213-214 (2003); *Peterson* v. *Assessors of Boston*, 62 Mass. App. Ct. 428, 432-433 (2004).

We conclude that the judge's findings as to amounts constituting reasonable compensation for the individual defendants were based on sufficient evidence and were not clearly erroneous. See *Fechtor* v. *Fechtor*, 26 Mass. App. Ct. at 863; *Haskell* v. *Versyss Liquidating Trust*, 75 Mass. App. Ct. at 129.

2. *Derivative versus direct remedy.* The defendants also challenge the derivative nature of the remedy. The law is clear, however, that an action is derivative rather than direct when the claim is for excessive compensation, and that claims against officers for excessive compensation must be asserted through the corporation. *Black* v. *Parker Mfg. Co.*, 329 Mass. at 118. *Bessette* v. *Bessette*, 385 Mass. 806, 809 (1982). See *Diamond* v. *Pappathanasi*, 78 Mass. App. Ct. 77, 87-88 (2010) (claims against controlling shareholders for dissipating corporate assets by paying themselves impermissible fees properly characterized as derivative). The judge found that the excessive compensation paid to the individual defendants constituted a disguised dividend that should have been distributed among all the shareholders.

The defendants complain that the remedy ordered by the judge will work a hardship, especially when other remedies were available that would accomplish the same end. "Courts have broad equitable powers to fashion remedies for breaches of fiduciary duty in a close corporation . . . and their choice of a particular remedy is reviewed for abuse of discretion." *Brodie* v. *Jordan*, 447 Mass. 866, 871 (2006). A remedy similar to the judgment here was imposed by this court in *Crowley* v. *Communications for Hosps., Inc.*, 30 Mass. App. Ct. at 766-768, where we rejected

the trial judge's order for direct relief to the plaintiff for wrongs done to the corporation. "If the defendants have denied the plaintiff any return on [his] investment while 'drain[ing] off the corporation's earnings' for themselves, *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 588-589 (1975), the judge may consider, among other possibilities, the propriety of compelling the declaration of dividends." *Brodie* v. *Jordan*, 447 Mass. at 874. The defendants have not persuaded us that the judge abused his discretion in the remedy ordered here.[16]

3. *Statute of limitations.* The judge permitted Rubin to recover his share of the excess compensation as far back as 1995, relying on the six-year statute of limitations for contract actions. We see no error in the judge's reliance on *Von Arnim* v. *American Tube Works*, 188 Mass. 515, 517-520 (1905) (suit to recover corporate officers' excessive salaries may be brought as an action for money had and received), and *Kagan* v. *Levenson*, 334 Mass. 100, 103 (1956) (six-year statute of limitations for contract actions applied to suit to recover proceeds from sale of corporate assets, as one for money had and received), in treating Rubin's claim as one for money had and received and applying the six-year statute of limitations.[17]

The defendants rely, instead, on *Woodcock* v. *American Inv.*

---

[16]As has been noted, the judgment requires the individual defendants to reimburse Olympic for the excessive compensation they paid themselves and then provides that Olympic will pay any taxes owed from the money returned. The defendants object that the remedy will cause the individual defendants and Olympic to suffer significant tax consequences. This argument is unavailing because they cannot be heard to complain that they will suffer consequences as a result of the individual defendants' improper actions wherein they paid themselves additional compensation to avoid having to pay taxes. See *Crowley* v. *Communications for Hosps., Inc.*, 30 Mass. App. Ct. at 759 n.12 (where the defendants argued that " 'it was advantageous for tax purposes for the corporation to pay salaries rather than declare dividends[,]' [i]t would seem that the defendants had no understanding of their obligations as directors, officers and controlling stockholders in a closely held corporation"). Moreover, the tax consequences and considerations are one of the reasons that a direct remedy would not accomplish the same end as a derivative remedy.

[17]"An action for money had and received lies to recover money which should not in justice be retained by the defendant, and which in equity and good conscience should be paid to the plaintiff." *Cannon* v. *Cannon*, 69 Mass. App. Ct. 414, 423 (2007) (claim for money had and received where wife of deceased breached her contractual obligation to share life insurance proceeds with deceased's children and kept full amount for herself).

*Co.*, 376 Mass. 169, 173-175 (1978), which held that a deriva-
tive claim for conversion of corporate funds was a tort action
governed by the three-year statute of limitations. But the Supreme
Judicial Court instructed that "[w]e start with an analysis of
precisely what alleged wrongs to the company lie at the base of
the plaintiffs' derivative action" to determine the relevant statute
of limitations. *Id.* at 173. See *Kirley* v. *Kirley*, 25 Mass. App.
Ct. 651, 653 (1988) (though "the line between the two types of
claims for these purposes is not sharp," minority shareholder's
freeze-out claim for wrongful termination and depletion of
corporate assets sounded in tort).

Here, the wrong alleged by Rubin was that the individual
defendants paid themselves disguised dividends in the form of
excessive compensation, depriving Rubin of his right to share in
the distribution of profits pursuant to his ownership of stock.
We recently observed in *Diamond* v. *Pappathanasi*, 78 Mass.
App. Ct. at 97 n.32, that there was no error in applying the six-
year contract statute of limitations to a derivative claim to recover
funds that were paid to a director in violation of the articles of
incorporation. That the defendants themselves asserted throughout
this litigation that Rubin's right to profits was contractual, to be
determined in accordance with Olympic's articles of organiza-
tion, lends further support to the judge's ruling that the statute of
limitations consistent with the contractual basis for Rubin's claim
should apply. See, e.g., *Lewis* v. *H.P. Hood & Sons, Inc.*, 331
Mass. 670, 676 (1954) (shareholder "gets what he bargains for"
under articles of incorporation).

4. *Attorney's fees.* Olympic's articles of incorporation prohibit
the corporation from paying the attorney's fees of an officer or
director where they "have not acted in good faith in the reason-
able belief that his action was in the best interests of the cor-
poration." The defendants complain that the judge's order that
the individual defendants repay Olympic amounts paid for their
attorney's fees in this action was not supported by the requisite
finding of bad faith. But the judge specifically ruled that the
individual defendants owed Rubin a fiduciary duty of good
faith and loyalty, and that they breached that duty by paying
themselves excessive compensation. "The fairness of such
salaries is open to examination . . . *for the benefit of the*

*corporation."* *Bessette* v. *Bessette*, 385 Mass. at 809, quoting from *Stratis* v. *Anderson*, 254 Mass. 536, 539 (1926). See *Crowley* v. *Communications for Hosps., Inc.*, 30 Mass. App. Ct. at 758-759 (excessive compensation that "deprives the company, and therefore its stockholders, of all opportunities for growth in net worth, serves no legitimate business purpose"). From this, we are satisfied that the judge's finding that the individual defendants breached their fiduciary duty of good faith equated to a finding of lack of good faith regarding Olympic's best interests and supported the repayment of the individual defendants' legal fees to Olympic. Cf. *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. at 561-562. See *Astra USA, Inc.* v. *Bildman*, 455 Mass. 116, 141 n.38 (2009), cert. denied, 130 S. Ct. 3276 (2010).

*Judgment affirmed.*